## MEANS v. DOWD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF NORTH CAROLINA.

No. 47. Argued October 30, 1888. — Decided November 19, 18°8.

An insolvent debtor, making an assignment for the benefit of his creditors, cannot reserve to himself a beneficial interest in the property assigned, or interpose any delay, or make provisions which would hinder and delay creditors from their lawful modes of prosecuting their claims.

In this case the deed of assignment, which forms the subject of controversy, has the obvious purpose of enabling the insolvent debtors who made it to continue in their business unmolested by judicial process, and to with-draw everything they had from the effect of a judgment against them.

Though this bill is not sustainable under the provisions of the bankrupt act against a preference of creditors in fraud of the act, because the proceedings were not commenced within the time prescribed by that act as necessary to avoid a preference, yet a right is shown to relief on the ground that the instrument was made to hinder and delay creditors.

THIS was an appeal from a decree of the Circuit Court of the United States for the Western District of North Carolina, dismissing a bill brought by Paul B. Means, assignee in bankruptcy of Charles G. Montgomery and Charles D. Dowd, partners, composing the firm of Montgomery & Dowd, against Clement Dowd, A. B. Davidson, Charles. G. Montgomery and Charles D. Dowd.

On and prior to the 24th day of April, 1876, the firm of Montgomery & Dowd carried on a mercantile business in the town of Concord, North Carolina. About that time they became embarrassed, and on that date made a conveyance in writing of all their goods and personal property to A. B. Davidson and Clement Dowd of Charlotte, in the same State, which instrument is variously called a "deed of trust," an "assignment," or a "mortgage." Although the grantors asserted that they did not consider themselves as being insol vent at the time, it is very evident now, in the light of subsequent circumstances, that they were entirely so. They had a very considerable stock of goods, which does not seem to have

been inventoried in reference to this transfer, and a large amount relatively to their business was outstanding debts due them growing out of that business. The stock of goods was old and needed replenishing; the notes and accounts due them were in many cases worthless and never have been paid. They were also indebted in a large amount (quite as much probably as they were worth) to certain banks in Charlotte upon promissory notes, indorsed by A. B. Davidson and Clement Dowd, sometimes jointly and in other cases separately.

Davidson was the father-in-law of Charles G. Montgomery and the vice-president of the Merchants' and Farmers' National Bank, one of the creditors secured by this conveyance. Clement Dowd, the other grantee, was a brother of Charles D. Dowd, one of the grantors, and also president of the Commercial National Bank, a preferred creditor. W. J. Montgomery was a brother of Charles G. Montgomery, and he and Davidson and Clement Dowd appear as indorsers upon some of the notes set forth in the instrument referred to.

This conveyance, although made in April, was not placed on record until the 12th day of July, 1876, thereafter, and the grantors, Montgomery & Dowd, remained in possession and had absolute control of the property until shortly after that period. The instrument itself was filed as "Exhibit A," and was as follows:

"Exhibit A.

"This indenture, made this 24th day of April, 1876, by Chas. G. Montgomery and Chas. D. Dowd, partners, trading under the firm and style of Montgomery & Dowd, of Concord, North Carolina, parties of the first part, and A. B. Davidson and C. Dowd, of Charlotte, in the State aforesaid, parties of the second part,—witnesseth: That whereas the parties of the first part are indebted as follows: By a certain promissory note, of even date with these presents, given to the Commercial National Bank of Charlotte, N. C., for three thousand dollars, and endorsed by the said A. B. Davidson and C. Dowd; also by a certain other note to the said bank for one thousand dollars, dated the — day of ——, 1876, due

at sixty days, and endorsed by W. J. Montgomery; also by another note of five hundred dollars to the said bank of even date herewith, endorsed by .C. Dowd, and due at sixty days; also by another note to said bank of thirty-four hundred dollars, secured by customer's notes in the hands of Montgomery & Everitt, att'ys, bearing date the — day of ——, and due at sixty days; also by two other notes of one thousand dollars each to the First National Bank of Charlotte, endorsed by A. B. Davidson, dated, respectively,. on the 25th March and 5th April, 1876, and running to maturity at sixty days; also by a note to the Merchants' & Farmers' National Bank of Charlotte for one thousand dollars, dated the — day of ——, 1876, at sixty days, and endorsed by A. B. Davidson; also by another note to the last-named bank for five hundred dollars, endorsed by W. H. Lilly; also by another note to said M. F. National Bank for one thousand dollars, endorsed by J. R. Neisler, and by another note to said bank for five hundred dollars, endorsed by R. S. Harris; also by. a note to Martin Boyer, Jr., —— dollars, and note to D. P. Boger for ——; also by a note to J. A. Lilly for four hundred dollars:

"Now, in order to provide for the payment of the said debts, and to indemnify and save harmless the said endorsers, the parties of the first part do hereby bargain, sell, convey, and transfer unto the said A. B. Davidson and C. Dowd the following property, to wit: The entire stock of goods, wares, and merchandise of every kind and description now in the, possession of the parties of the first part and in and about their store in Concord, together with all the fixtures and personal property used in connection with the said store and, business; also such goods, wares, and merchandise as the parties of the first part may purchase to renew or replenish the said stock; also all the notes, accounts, mortgages, judgments, and other evidences of debt due and belonging to the parties of the first part, from whomsoever and howsoever the same may be due.

"To have and to hold the said property and the said choses in action and evidences of debt to the said A. B. Davidson and C. Dowd, their executors and assigns, in special trust as follows:

"The said parties of the first part are to remain in the possession of the said property and choses in action and continue to sell the goods for cash only and to collect under the direction and control of the parties of the second part, the proceeds to be deposited weekly in the Commercial National Bank of Charlotte, N. C., and applied under the direction of the parties of the second part to replenish the stock by such small bills as may be agreed upon and to the payment of the debts of the said firm as follows: First, after deducting and retaining the commissions and other expenses of this trust, to the payment of the note of three thousand dollars to the Commercial National Bank of Charlotte, of even date herewith, endorsed by the said A. B. Davidson and C. Dowd, the same being given for money this day borrowed for the exclusive use and benefit of the said firm and also to the payment of any renewal or substitution of the said note and of any other note or notes that may hereafter be given by said firm, and endorsed by the said parties of the second part, or either of them, not being renewals of the notes endorsed by them, or either of them, mentioned and provided for in the next class; secondly, to the payment of all the debts hereinafter mentioned, except the debt of three thousand dollars and other possible indebtedness hereafter to be incurred, as provided for in the first class above named; thirdly, to the payments of all the other indebtedness of the said firm, howsoever and to whomsoever the same may be due, any surplus to be paid over to the parties of the first part or their legal representatives or assigns.

"And it is further the understanding and agreement that if any of the said debts or any renewal or substitution of them, or any of them shall not be paid when the same shall become due, or if, for any other cause, the parties of the second part may so elect, then and in that case it shall be lawful for the parties of the second part, and they are hereby expressly authorized, to take possession of the said goods and merchandise, and all the property and choses in action conveyed herein, and dispose of the same at public or private sale, as they may deem best, applying the proceeds as hereinbefore directed.

" In witness whereof the parties of the first part do hereto set their hands and seals the day and year aforesaid.

" (S'g'd)       CHAS. G. MONTGOMERY.  [SEAL.]
"             CHAS. D. DOWD.         [SEAL.]

" Witness : W. P. SIMPSON.

" Probated July 11th, 1876. Registered same day."

It appeared that at the term of the Concord Superior Court, held in July, 1876, a suit was pending against the bankrupts in favor of Calvin Chestnut, one of the unsecured creditors, which had been in the hands of an attorney for collection since sometime during the preceding April. Several of the New York creditors also commenced proceedings during the autumn of that year, against the insolvent firm, and obtained judgments at the October Term of the United States Circuit Court against Charles G. Montgomery and the firm of Montgomery & Dowd. After executions issued thereon had been returned *nulla bona,* these creditors filed a bill to set aside the deed executed by the firm as fraudulent and void.

In December, 1876, proceedings were instituted by which the firm of Montgomery & Dowd were adjudicated bankrupts, and the appellant, Means, was duly appointed their assignee in bankruptcy. Very soon afterwards he commenced the present suit in the Circuit Court to set aside the conveyance above recited as being fraudulent and void under the statute of 13 Eliz. and the United States bankrupt act. After the filing of this bill the complainants in the first one, the New York creditors above referred to, proved their debts in bankruptcy, and asserted their lien upon the assets created by the bill in equity filed in December, 1876, and the first suit has been considered in abeyance ever since and treated as merged in the proceeding instituted by the assignee in bankruptcy.

To the bill brought by the assignee both of the grantors and the grantees in the deed of assignment were made defendants, and each of them filed answers. There was the usual denial of any fraudulent purpose in the transaction, and allegations that the parties were doing the best they could under the circumstances to secure a proper distribution of their prop-

erty among their creditors. After considerable testimony. was taken, in which all the parties to the deed were sworn, the Circuit Court dismissed the bill, and it was from that decree that the assignee took the present appeal.

*Mr. Henry M. Herman* for appellant.

*Mr. W. W. Fleming* and *Mr. Willis B. Dowd* for appellees.

I. As the second bill sets up the same equity and asks the same relief between the same parties as the first bill still pending, the second bill should be dismissed. It is against the policy of the law to allow multiplicity of suits between the same parties about the same matter. All that the plaintiffs in the first bill had to do, and such was their duty, was to amend the bill by making the assignee a party and proceeding with it. *Fellows* v. *Hall*, 3 McLean, 487; *Gray* v. *Atlantic and N. C. Railroad Co.*, 77 N. C. 299 *and cases cited;* *Childs* v. *Martin*, 69 N. C. 120, 189, 387.

II. Where a trust has been *executed* before the filing of the bill to set it aside the court will not take jurisdiction. The preferred debts were as just and meritorious as the unpreferred, and as much entitled to be paid out of the property of the firm. And even where an assignment is set aside for fraud. the assignee is not answerable for payments made under it, to *bona fide* creditors, before the filing of the bill. *Carroll* v. *Johnston*, 2 Jones' Eq., 120 ; *Cheatham* v. *Hawkins*, 76 N. C. 335.

III. The deed of trust not being fraudulent in law as it was executed under the laws of North Carolina governing the subject, the construction put upon such instruments by the highest courts of the State must control. *Allen* v. *Massey*, 17 Wall. 351.

In *Young* v. *Booe*, 11 Iredell, 347, a deed of trust for payment of debts conveyed real and personal estate and provided that the maker of the deed should remain in possession for eleven months, and during that time his family might be supported out of the proceeds of the property. It was held that

these provisions did not make the deed fraudulent in law, upon its face, but as the provisions might have been for the benefit of the creditors as well as of the debtor, the question of fraudulent intent was one upon which the jury must decide under all the circumstances.

In *Hardy* v. *Skinner,* 9 Iredell, 191, the trust deed stipulated that a sale should not take place for three years, and that the grantor should remain in possession of the property. It was held by the court that whether the deed was fraudulent or not was a matter for a jury, under all the circumstances, but that the court could not, from what appeared on the face of the deed, say it was fraudulent in point of law, because there might be many circumstances under which such a deed would be good. To the same effect are *Lee* v. *Flannagan,* 7 Iredell, 471; *Gilmer* v. *Earnhart,* 1 Jones (N. C.) 559.

In *Cheatham* v. *Hawkins,* 76 N. C. 335, the rule is announced that, "to find fraud as a matter of law, it must so expressly and plainly appear in the deed itself as to be incapable of explanation by evidence, *dehors.*"

This court in *Robinson* v. *Elliott,* 22 Wall. 513, have laid down substantially the same rule.

IV. If anything has been settled by judicial decisions, it is settled by the Supreme Court of the United States, and by the Supreme Court of North Carolina, that a deed of trust for the benefit of creditors, like the subject of the controversy in this case, is not fraudulent and void in law upon its face. The possession of these grantors, such as it was, was both proper and commendable, inasmuch as they were best qualified and most competent to close out, by sales and collections, a stock of merchandise, in a village, where they were best acquainted with the customers to whom they had extended credits. So held in *Tompkins* v. *Wheeler,* 16 Pet. 106; *Dewey* v. *Littlejohn,* 2 Iredell Eq. 495, 507; *Hafner* v. *Irwin,* 1 Iredell, 490; *Irwin* v. *Wilson,* 3 Jones Eq. 210.

V. The deed of trust was not fraudulent in fact. A conveyance upon a valuable consideration cannot be declared void as to creditors, though made with a fraudulent purpose on the part of the vendor, unless the vendee participates in or

had notice of such purpose. *Lassiter* v. *Davis*, 64 N. C. 498; *Reiger* v. *Davis*, 67 N. C. 185; *Humphreys* v. *Ward*, 74 N. C. 784; *Worthy* v. *Coddell*, 76 N. C. 82. To the same effect is *Astor* v. *Wells*, 4 Wheat. 466, upon the construction of the Ohio statute, which is similar to ours. So in the most recent case decided in the Supreme Court of the United States. *Prewit* v. *Wilson*, 103 U. S. 22. Field, J., delivering the opinion of the court, says: "When a deed is executed for a valuable and adequate consideration, without knowledge by the grantee of any fraudulent intent of the grantor, it will be upheld, however fraudulent his purpose. To vitiate the transfer in such case, the grantee also must be chargeable with knowledge of the intention of the grantor." p. 24.

So it is held in North Carolina, that an insolvent has a right to prefer one or several among his creditors, although the effect is to hinder and delay others. *Lee* v. *Flannagan*, 7 Iredell, 471; *Lewis* v. *Sloan*, 68 N. C. 557; *Hislop* v. *Hoover*, 68 N. C. 141; *Tompkins* v. *Wheeler*, 16 Pet. 106.

The federal courts will follow the decisions of the courts of last resort in the State where conveyance is made, in passing upon its validity as to creditors. *Allen* v. *Massey*, 17 Wall. 351.

MR. JUSTICE MILLER, after stating the case, delivered the opinion of the court.

We are of the opinion that, whether the case be decided upon the face of the instrument itself, or in view of the testimony as to the conduct of the parties, the decree should be in favor of the complainant. The principles, if not the exact language of the statute of 13 Eliz., have been accepted in the equitable jurisprudence of nearly all the States of common-law origin, and they are the law of North Carolina, with a modification which is attempted to be applied to this case. That is, that where the question of the validity of an instrument of this kind, or any other conveyance of property depends upon its fraudulent character, it must be shown that the grantee participated in the fraud, and the fact that the

grantor alone is guilty of it is not sufficient to invalidate the instrument.

Conceding this to be the doctrine of the State of North Carolina, we are of opinion that it can have no important application to the case before us, because the fraud here is one in law as distinguished from actual fraud; that is to say, that while the parties to this transaction, either grantors or grantees, probably never had in view the ultimate loss of the debts of the unsecured creditors by their acts, and may really have supposed that they were taking the best means to insure payment to them all, yet the law has said that the means which they took is to be regarded as a fraud in law by necessary implication.

All experience has shown how very common it is for failing or insolvent debtors, who have any considerable means on hand, and especially in cases where a mercantile business of considerable value is still going on, to delude themselves with the idea that if they can get time they can pay their debts; that if their creditors will delay until they can make such arrangements as they believe themselves capable of, they will be able to pay everybody, and even to save a very considerable surplus out of their business. This delusion leads them to undertake to obtain this delay by means which the law does not sanction. If the creditors refuse to extend time on their obligations, and thus give them the delay which they deem necessary, or if they fear to expose their condition to their creditors, they adopt, in many instances, the principle of making an absolute sale to certain friends, who will settle up their affairs and return to them any surplus, or they make assignments or deeds of trust, conveying the title to all their property to some trustee or assignee and vesting it in them, thus opposing an obstruction to the efforts of creditors at law to collect the amounts which may be due to them. In this manner they frequently take the law into their own hands, and attempt to secure that delay which can only be obtained by the consent of the creditors, or by such a conveyance as leaves the creditors in no worse condition than they were before.

It has always been held that whatever transfer of this char-

acter, that is, of the title to property by a failing or insolvent debtor, may be valid, any instrument which secures to the assignor an interest in or an unlimited control over the property conveyed, and which has the effect of hindering or delaying creditors, is void as being a fraud upon those creditors.

A very similar case to the one before us was that of *Griswold* v. *Sheldon*, 4 N. Y. (4 Comst.) 580, in which the court decided that the mortgage which, besides permitting the mortgagor by its terms to retain possession of the goods, and on its face conferred on him the power to sell and dispose of them as his own, was, therefore, fraudulent and void in law as to creditors.

Another decision of like character was made in *Nicholson* v. *Leavitt*, 6 N. Y. (2 Seld.) 510, the head note of which correctly expresses what was decided in the following words: "An assignment by insolvent debtors of their property to trustees for the benefit of their creditors, authorizing the trustees to sell the assigned property *upon credit*, is fraudulent and void as against the creditors of the assignors." This is founded upon the ground that such a provision has the effect of hindering and delaying creditors.

A very instructive case, and very like the one before us, is that of *Davis* v. *Ransom*, 18 Illinois, 396. A chattel mortgage of a stock of goods had been made, reciting the indebtedness of the mortgagor, but with an agreement that he should keep possession of the goods and sell them in the usual course of trade. Out of the proceeds he was to pay certain preferred creditors, dividing the remainder pro rata among the others, with the right in the mortgagee to take possession of the property under certain contingencies. This mortgage was held void upon the principles already cited.

To the same effect is the case of *Bank* v. *Hunt*, 11 Wall. 391, which cites with approval the case of *Griswold* v. *Sheldon, supra.*

But this whole subject has been so frequently discussed in the American courts that it would be an immense labor to go very extensively into the authorities. The prevailing doctrine, however, is unquestionably that which we have stated,

and its fundamental essence is, that an insolvent debtor making an assignment, even for the benefit of his creditors cannot reserve to himself any beneficial interest in the property assigned, or interpose any delay, or make provisions which would hinder and delay creditors from their lawful modes of prosecuting their claims.

In the case before us the whole face of the instrument has the obvious purpose of enabling the insolvent debtors who made it to continue in their business unmolested by judicial process, and to withdraw everything they had from the effect of a judgment against them; for it is shown that, except the goods in this place of business transferred by the conveyance, they had nothing of value but one or two pieces of real estate encumbered by mortgage for all they were worth. It specifically provides that the grantors shall remain in possession of the said property and choses in action, with the right to continue to sell the goods and collect the debts under the control and direction of the grantees. The collections were to be deposited weekly in the Commercial National Bank of Charlotte, N. C., and applied, under the direction of the assignees, "to replenish the stock by such small bills as may be agreed upon, and to the payment of the debts of the said firm," specifically mentioned therein, being principally notes held by the banks, indorsed by the grantees, Davidson and Dowd. It also contained a provision for the renewal of these notes, without limitation as to time, and authorizing the trustees, "if any of the said debts or any renewal or substitution of them, or any of them, shall not be paid when the same shall become due, or if, for any other cause, the parties of the second part may so elect, then and in that case it shall be lawful for the parties of the second part, and they are hereby expressly authorized, to take possession of the said goods and merchandise, and all the property and choses in action conveyed herein, and dispose of the same at public or private sale, as they may deem best, applying the proceeds as hereinbefore directed."

It is difficult to imagine a scheme more artfully devised between insolvent debtors and their preferred creditors to enable the former to continue in business, at the same time withdraw-

ing their property used in its prosecution from the claims of other creditors which might be asserted according to the usual forms of law. So long as these debtors were able to pay the interest, and keep the trustees satisfied that they were not going to lose anything by the delay, the business could go on and the property of the insolvent firm be safe from execution and attachment.

The interest paid on these renewals was twelve per cent, and as the indorsers on the notes were officers of the banks who held the paper, as well as trustees under this assignment, to say nothing of the fact that they were closely related to the bankrupt debtors, it is easy to be seen that, as long as they had security, they would be willing to renew these notes and indorse them on each renewal. So that by the mere expedient of paying the interest on this indebtedness Montgomery & Dowd had it in their power to continue in their business, whether profitable or otherwise, with a large stock of goods on their shelves, and defy the creditors who were not protected. The authority to take possession of the goods, even when the trustees should deem such action proper, is accompanied by no direction for an immediate sale or winding up of the business; but, on the contrary, their discretion, as to whether they shall take possession or not, and as to how or upon what terms they shall sell, seems to be absolute, and intended even then to be controlled for their own benefit and that of the debtors, without regard to the unsecured creditors.

The case before us is almost precisely like that of *Robinson* v. *Elliott*, 22 Wall. 513. In that action it appeared that John and Seth Coolidge were partners in the retail dry goods trade in Evansville, Indiana; that they owed the First National Bank $7600, and a Mrs. Sloan $3174, for money previously borrowed of her to aid them in their business. To secure to Mrs. Sloan the payment of what was due her, and to indemnify Robinson, who was an indorser, they made to them a chattel mortgage upon their stock of goods then in a rented store. The mortgage, after reciting the liability of the firm to Robinson on the notes indorsed by him, stated that it was contemplated that it might become necessary to renew the

notes or to discount other notes. It was also stated that the note to Mrs. Sloan might be renewed at maturity if it was not convenient for the firm to pay it. The mortgage then proceeded in the following language : " And it is hereby expressly agreed that until default shall be made in the payment of some one of said notes, or some paper in renewal thereof, the parties of the first part may remain in possession of said goods, wares and merchandise, and may sell the same as heretofore and supply their places with other goods, and the goods substituted by purchase for those sold shall, upon being put into said store, or any other store in said city, where the same may be put for sale by said parties of the first part, be subjected to the lien of this mortgage."

Although the mortgage was duly recorded, it was held by this court to be void under the statute of frauds of Indiana. Section 10 of that act declared that no such assignment or mortgage should be valid unless acknowledged " as provided in cases of deeds of conveyance, and recorded in the recorder's office of the county where the mortgagor resides, within ten days after the execution thereof." Section 21 makes the further provisions : " The question of fraudulent intent in all cases arising under the provisions of this act shall be deemed a question of fact, nor shall any conveyance or charge be adjudged fraudulent as against creditors or purchasers solely upon the ground that it was not founded on a valuable consideration."

This court, in a lengthy review of the effect of recording acts, and of the doctrine of the statute of 13 Eliz., held that the recording of the mortgage contemplated by the statute was intended as a substitute for possession, but " was not meant to be a protection for all the other stipulations contained in it." It was also held that the court was the proper party to say whether on its face the mortgage was void, and that it was so void.

It was argued in that case that there could be no such thing as constructive fraud, because under this statute the question of fraudulent intent was one of fact ; but this court, following the Supreme Court of Indiana, said that those provisions of

the statute of that State had not changed the law on the subject, and that the court must in the first instance determine upon the legal effect of the written instrument, and if that be to delay creditors, it must be rejected.

In the opinion the court said, p. 524: "But there are features engrafted on this mortgage which are not only to the prejudice of creditors, but which show that other considerations than the security of the mortgagees, or their accommodation even, entered into the contract. Both the possession and right of disposition remain with the mortgagors. They are to deal with the property as their own, sell it at retail, and use the money thus obtained to replenish their stock. There is no covenant to account with the mortgagees, nor any recognition that the property is sold for their benefit. Instead of the mortgage being directed solely to the *bona fide* security of the debts then existing, and their payment at maturity, it is based on the idea that they may be indefinitely prolonged. As long as the bank paper could be renewed, Robinson consented to be bound, and in Mrs. Sloan's case it was not expected that the debt would be paid at maturity, but that it would be renewed from time to time, as the parties might agree. It is very clear that the instrument was executed on the theory that the business could be carried on as formerly by the continued indorsement of Robinson, and that Mrs. Sloan was indifferent about prompt payment. The correctness of this theory is proved by the subsequent conduct of the parties, for the mortgagees remained in possession of the property, and bought and sold and traded in the manner of retail dry-goods merchants from July 7th, 1871, to August 7th, 1873. . . . It hardly need be said that a mortgage which, by its very terms, authorizes the parties to accomplish such objects is, to say the least of it, constructively fraudulent. Manifestly it was executed to enable the mortgagors to continue their business, and appear to the world as the absolute owners of the goods, and enjoy all the advantages resulting therefrom. . . . This conduct is the result of trust and confidence, which, as Lord Coke tells us, are ever found to constitute the apparel and cover of fraud. . . . Whatever may have been the motive which actuated

the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time. A mortgage which, in its very terms, contemplates such results, besides being no security to the mortgagees, operates in the most effectual manner to ward off other creditors; and where the instrument on its face shows that the legal effect of it is to delay creditors, the law imputes to it a fraudulent purpose. The views we have taken of this case harmonize with the English common-law doctrine, and are sustained by a number of American decisions."

Other authorities sustain this view of the subject, and the instrument now under consideration, in the opinion of the court, contains all the elements denounced in the case above quoted of *Robinson* v. *Elliott* as proof of constructive fraud.

If we examine into the acts of the parties in connection with this transfer, we shall see that they were in accordance with this purpose of hindering and delaying creditors. There was but one witness to the instrument and he was the confidential bookkeeper of the bankrupts. He states that he put his name to it as a witness on the day that it bears date, but that he did not read it, nor was he informed of its contents, and although it is said by some witness that the conveyance was delivered at or about the time it is dated, the grantees were not present when this witness put his name to it.

The law of North Carolina, like that of all other States, provides for the recording of such instruments as this, and that until so recorded they are not valid as against creditors and purchasers without notice. In the present case it was kept from record from the time of its date, the 24th of April, until the 11th day of July thereafter. This was undoubtedly the act of the grantees in the deed, the parties whose obligations for the bankrupts were secured by it, and who were the trustees appointed by it for its execution. The period it was thus kept secret was as long as it could be with safety to the purpose of hindering and delaying creditors; for as soon

as it was known that Calvin Chestnut was about to procure a judgment, which, either by virtue of the judgment itself, or by a levy of an execution upon the goods, would become a lien, the paper was recorded for the undoubted purpose of preventing this result.

The bankrupts were permitted for several months to continue in the possession and control of these goods, and to deal with them as their own, and even when the trustees did seem to consider it necessary to interpose and take the matter into their own hands, the manner in which they did it is open to animadversion. It does not appear that they went in person to the building and took possession of it or of the goods. On the contrary they made no change in its appearance, or in the manner of conducting the business. No sign was put up indicating that any change of ownership had taken place. The same books were currently kept by the the same bookkeeper, and entries were made in the same manner as before. The two bankrupts were also employed by the assignees to conduct the business, at a salary of $100 per month each, and they continued it in precisely the same manner as it had been previously, with the exception of depositing the moneys arising therefrom, as they allege, in bank according to the directions of the trustees. In fact, so far as the outside public was concerned, the whole affair was conducted before the recording of this assignment, and until the appointment of the assignee in bankruptcy, in the same manner that it had always been before the conveyance was executed. Then it seemed to occur to the trustees that the time had come to wind up this business, and although it was not done with any extraordinary expedition, it is not necessary to hold that there was anything actually fraudulent in the manner in which it was finally accomplished.

These are circumstances which, taken in connection with the provisions of the deed itself, show very clearly that, in the minds of the assignors and the assignees, one of the effects of this instrument, and of the operations conducted under it, was undoubtedly to hinder and delay creditors. Indeed, it is impossible to believe that this effect was not intended by all the parties to the deed.

Syllabus.

The suit in this case is not sustainable under the provision of the bankrupt act against a preference of creditors in fraud of the law, because the bankruptcy proceedings were not brought within the time prescribed by that act as necessary to avoid such preference. But a right is shown to relief on the ground that the instrument was made to hinder and delay creditors.

*The decree of the Circuit Court is, therefore, reversed, and the case remanded to that court, with instructions to refer the case to a master, before whom the defendants, the trustees, must account for the property conveyed to them by the instrument.*

*In this accounting all the creditors, secured and unsecured, must be brought into a concourse and held to an equal right in distribution of the funds arising from the sale of the goods and the choses in action assigned to the trustees. But in accounting with the trustees they must be credited with what they have paid to any of the creditors, so far as those creditors would be entitled on an equal and pro rata distribution among all the creditors of all the assets conveyed to them by the deed of trust.*