## HUNTLEY v. KINGMAN.

ERROR TO THE UNITED STATES COURT FOR INDIAN TERRITORY.

No. 256.  Argued March 12, 1894.— Decided April 2, 1894.

An assignment made in Indian Territory on the 29th day of July, 1889, by a debtor in failing circumstances, of a portion of his property to a trustee for the benefit of several persons who had become sureties on notes of the assignor not then due, being made in good faith and for a valuable consideration, was valid as against attaching creditors of the assignor, the common law being at that time in force in the Territory, and not the statutes of Arkansas which were subsequently extended and put in force in the Territory by the act of May 2, 1890, c. 182, 26 Stat. 81.

At common law a debtor in failing circumstances has a right to prefer creditors, though the fund for the payment of other creditors be lessened or absorbed thereby.

THIS action was originally begun September 28, 1889, by Kingman & Co., a corporation organized under the laws of Illinois, against one Duncan, whose Christian name is not given, and whose surname is sometimes spelled Duncum and sometimes Duncan, a white man, a citizen of the United States, and a resident of the Indian Territory, to recover the sum of $1994.42 with interest and exchange, being the amount of two promissory notes made by Duncan, payable to the order of the plaintiff, but not then due.   The complaint contained an allegation that Duncan, the defendant, had disposed of his property, and had suffered it to be sold, with intent to defraud his creditors, and to hinder and delay them in the collection of their debts, and also that he was about to remove his property, or a material part thereof, out of the Indian Territory, with fraudulent intent, etc., and prayed for an attachment and a judgment.   On the same day a formal affidavit for an attachment was filed, and a writ issued.

Pursuant to the attachment, the marshal seized a stock of goods as the property of Duncan, and plaintiffs in error filed an interplea, setting up that the interpleaders were sureties for the defendant Duncan, upon certain promissory notes, two

of which were then overdue, and that on July 27, 1889, Duncan, for the purpose of saving his sureties harmless, executed and delivered to one Salters, whose Christian name is not given, as trustee, a deed of trust of his stock of goods. That immediately after the execution of such deed, Salters, at the instance of the beneficiaries, took absolute possession of the property named in the deed of trust, and began the discharge of his duties as trustee, advertised the property for sale, and had procured a buyer for the same at its full cash value, at the time the levy was made which stopped the sale; that, at the time of such levy, the trustee was in actual possession of the property; that the plaintiffs and the officers making the levy were notified of the fact; and that the notes, to secure which the deed of trust was given, were still unpaid and valid claims against Duncan and his sureties; that the deed of trust is a valid lien upon the property; that the property is not worth the amount of the lien, nor more than the sum of $2500; that a sale by the marshal would necessarily be attended with great loss, and that the trustee could sell the property at a much better advantage than the marshal. Wherefore the trustee and sureties prayed for an order restoring the property to the trustee, and for the execution of the trust.

The so-called deed of trust was as follows:

"STATE OF TEXAS, }
  *County of Cooke.* }

"Know all men by these presents, that I, W. H. Duncan, a resident of the Indian Territory, for and in consideration of the sum of ten dollars paid by J. J. Salters, the receipt of which is hereby acknowledged, have sold, and by these presents do sell, transfer, convey, and confirm, unto the said J. J. Salters and to his successors in this trust the following-described property, to wit: The storehouse now owned and occupied by the said W. H. Duncan, at Beef Creek, in the Indian Territory, the fixtures therein, and all goods, wares, and merchandise contained in said house, and the books, notes, and accounts of said W. H. Duncan in said business, it being

intended hereby to include all stock owned by said W. H. Duncan in his business as a general merchant at Beef. Creek, I. T.; also all cattle and horses owned by him at said Beef Creek, together with all and singular the right and appurtenances to the same in any manner belonging or appertaining; to have and hold all and singular the property above described unto the said J. J. Salters or substitute forever. This conveyance is, however, intended as a trust for the better securing of S. M. Huntley, Samuel Paul, S. M. White, and James Rennie against the payment of three promissory notes on which I am principal, and which, as hereafter shown, they signed as sureties; which said notes are as follows."

[Here follow copies of three notes, one by Duncan, White, and Rennie, for $1550, one by Duncan, Paul, and Rennie for $2500, and one by Duncan and Huntley for $5165. The first two were due August 1, 1889, the last June 1, 1890.]

"Upon payment of which said promissory notes according to their face and tenor, being well and truly made, then in such case this conveyance is to become null and void, and shall be released at cost of said W. H. Duncan; but in case of failure or default of payment of said notes when they shall respectively become due, or of either of them, then the other of said notes shall be deemed due and payable; and in such event the said J. J. Salters is, by these presents, fully authorized and empowered, and it is made his special duty upon request of either or all the aforesaid beneficiaries herein at any time made after default as aforesaid, to sell the above described property to the highest bidder for cash in hand — selling at public or private sale, in bulk or retail, with or without advertisement as may seem to said trustee or his substitute best; and after said sale shall make the necessary conveyance of the property so sold, and the proceeds of said sale shall pay to the aforesaid beneficiaries herein, in proportion to the respective amounts for which each may be surety at the time of said sale, as evidenced by the above notes, and the payments that may be made thereon, in which notes all signing are sureties, except W. H. Duncan, and shall pay the expenses of this trust, including a commission of 5% to the trustee acting

hereunder, holding .the remainder subject to the order of the said W. H. Duncan. It is hereby especially provided that should the trustee named herein from any cause whatever fail or refuse to act or become disqualified from acting as such trustee, then the beneficiaries aforesaid, S. M. Huntley, S. M. White, Samuel Paul, and James Rennie, shall have full power to appoint a substitute, in writing, who shall have the same power as trustee hereinbefore named, and I, by these presents, ratify and confirm any and all acts which said trustee or substitute may do hereunder.

"Witness my hand this 27th of July, 1889.

"W. H. Duncan."

Kingman & Co. subsequently filed an answer to this interplea, averring that the notes secured by the deed of trust were void for usury, and for want of consideration; denied that the interpleaders were accommodation endorsers or sureties, or that the trust deed was valid, or gave to the interpleaders any right of property, and alleged that the instrument was made by Duncan for the purpose of placing his property beyond the reach of his creditors, and for the purpose of hindering and delaying them in the collection of their debts ; denied that Salters was acting for the beneficiaries named, and averred that he was a clerk of Duncan's and was assisting him in fraudulently disposing of his property, and that he took possession for the purpose of protecting the property from Duncan's creditors.

The case was tried upon the issue joined between Kingman & Co. and the interpleaders. Upon the trial, the court instructed the jury that the deed of trust under which the interpleaders claimed the property was fraudulent on its face ; that the same was sufficient for plaintiffs' attachment, and that the jury should return a verdict in its favor, which was accordingly done. The defendants in the proceeding sued out this writ of error.

*Mr. John J. Weed* for plaintiffs in error.

No appearance for defendants in error.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

This case turns upon the validity of the so-called deed of trust executed by Duncan to Salters to indemnify the plaintiffs in error for their signatures upon Duncan's notes.

The property conveyed consisted of a storehouse and its fixtures, together with all the goods, wares, and merchandise contained therein, and the books, notes, and accounts of Duncan in his business as a general merchant, as well as all cattle and horses owned by him at Beef Creek. The testimony indicated that the deed did not include all the property of Duncan, but that he also had a farm near Beef Creek, although the proof was not clear as to its size or value.

No brief was filed by the defendants in error, but in the court below the following clauses appear to have been relied upon as invalidating the deed:

1. The deed was to become null and void upon the payment of the notes secured by it, and there is an inference, though no express provision, that Duncan was to remain in possession until default.

2. Upon default in the payment of either of the notes it was made the duty of the trustee, upon the request of the beneficiaries, or either of them, to sell the property to the highest bidder for cash, either at public or private sale, with or without advertisement.

3. Upon such sale being made, the trustee was to pay to the beneficiaries in proportion to the amounts for which each might be surety at the time of the sale, *holding the remainder subject to Duncan's orders.*

The court instructed the jury that, by the reservation of the surplus, the deed was fraudulent upon its face, and was sufficient ground for the plaintiffs' attachment, and the jury were accordingly instructed to return a verdict for the plaintiffs.

The case must be determined by the application of the general principles of the common law to the questions involved. It is true, that, by act of Congress of May 2, 1890, c. 182, 26 Stat. 81, certain general laws of the State of Arkansas, among

which was a chapter relating to assignments for the benefit of creditors, were extended and put in force in the Indian Territory, until Congress should further provide. But the instrument in question in this case was made July 27, 1889, before this statute was enacted, so that neither the statutes of Arkansas, nor the decisions of the Supreme Court of that State, construing those statutes, constituted at the time a rule of decision of the United States court in the Indian Territory.

There is upon this record but little evidence of actual fraud in the execution of the instrument in question. The notes mentioned, the payment of which it was designed to secure, were given for money borrowed of Stevens & Henning, bankers of Gainesville, for the purchase of grain to feed certain cattle in which Stevens & Henning had an interest. The beneficiaries were joint makers with Duncan of the notes so given to Stevens & Henning. It is entirely well settled, both in England and America, that at common law a debtor in failing circumstances has a right to prefer certain creditors to whom he is under special obligations, though by such preference the fund for the payment of the other creditors be lessened or even absorbed. If, as must be conceded, he has the right to *pay* one creditor in preference to another, even where he is aware of his inability to pay all in full — in other words, where he is insolvent — there is no just reason why, in making provision for all, by way of assignment, he may not make special provision for some. *Marbury* v. *Brooks,* 7 Wheat. 556, 577; *Brashear* v. *West,* 7 Pet. 608; *Clarke* v. *White,* 12 Pet. 178; *Tompkins* v. *Wheeler,* 16 Pet. 106; *Grover* v. *Wakeman,* 11 Wend. 187, 194; *Tillou* v. *Britton,* 4 Halsted, (9 N. J. Law,) 120, 136; *Blakey's Appeal,* 7 Penn. St. 449, 451; Burrill on Assignment, § 160; Jones on Chat. Mtges. § 356.

The tendency of courts in modern times has been, not to hold instruments of this character to be fraudulent and void upon their face, unless they contain provisions plainly inconsistent with an honest purpose, or the instrument indicates with reasonable certainty that it was executed, not to secure *bona fide* creditors, but to enable the debtor to continue to carry on his business under cover of another's name. So early

as 1805, it was held by this court in *United States* v. *Hooe*, 3 Cranch, 73, that the mortgage of a part of his property, made by a collector of revenue to the surety upon his official bond, to indemnify him for his responsibility, and to secure him for endorsements at the bank, was valid against the United States, though it turned out that the mortgagor was unable to pay all his debts at the time the mortgage was given, and the mortgagee also knew at that time that he was largely indebted to the United States. It was contended that the mortgage was fraudulent upon its face, but the case was distinguished from *Twyne's case*, 3 Rep. 81, in the fact that in *Twyne's case* the deed was of *all* the property; was *secret;* was of *chattels*, and purported to be *absolute*, yet the vendor remained in possession and exercised ownership over them; while in the case then under consideration the deed was of a part of the property; was of record; was of lands, and purported to be a conveyance which left the property conveyed in the possession of the grantor. The case was also distinguished from *Hamilton* v. *Russell*, 1 Cranch, 309, in which this court declared an absolute bill of sale of a personal chattel, of which the vendor retained possession, to be a fraud. In *Lukins* v. *Aird*, 6 Wall. 78, an absolute deed of land, with a secret reservation to the grantor to possess and occupy it for a limited time, was held to lack the element of good faith, though made upon a valuable consideration; for, while it purported to be an absolute conveyance on its face, there was a secret agreement between the parties inconsistent with its terms, securing a benefit to the grantor at the expense of those he owed. The deed was held to be void by reason of the trust thus secretly created. So in *Robinson* v. *Elliott*, 22 Wall. 513, 524, a chattel mortgage, which provided that until default was made in the payment of the notes, the mortgagor might remain in possession of the goods, sell the same as theretofore and supply their places with other goods, which should become subjected to the lien of the mortgage, was held to be a fraud upon its face, although the mortgage was recorded according to law. The decision was put upon the ground that both the possession and the right of disposition were to remain with the mortgagors; "they are to

deal with the property as their own; sell it at retail, and use the money thus obtained to replenish their stock. There is no covenant to account with the mortgagees, nor any recognition that the property is sold for their benefit. Instead of the mortgage being directed solely to the *bona fide* security of the debts then existing, and their payment at maturity, it is based on the idea that they may be indefinitely prolonged. . . . It is very clear that the instrument was executed upon the theory that the business could be carried on as formerly by the continued endorsement of Robinson, and that Mrs. Sloan was indifferent about prompt payment." There was no ruling in this case, however, that a mere retention of possession would have avoided the mortgage. Upon the other hand, it was held in *Stewart* v. *Dunham*, 115 U. S. 61, that in the absence of fraud a transfer by a debtor in Mississippi of all his property to one of his creditors in satisfaction of his debt was valid. The case was disposed of as one of general law. And in *Estes* v. *Gunter*, 122 U. S. 450, a deed by an insolvent debtor in Mississippi to secure sureties upon his note, though made in advance of, and in contemplation of, a general assignment for the benefit of creditors, was held to be valid under the laws of that State, though containing a provision that the creditor should remain in possession until the maturity of the note. In this case, also, the common law did not seem to have been affected by any local statute. So, too, in *Smith* v. *Craft*, 123 U. S. 436, a bill of sale of a stock of goods, by way of preference of a *bona fide* creditor, was held not to be fraudulent as matter of law, by reason of a stipulation that the purchaser should employ the debtor at a reasonable salary to wind up the business.

The latest expression of this court upon the subject is contained in the case of *Etheridge* v. *Sperry*, 139 U. S. 266, in which certain creditors of one Hamilton were secured by chattel mortgages upon a stock of goods levied upon by an execution creditor. There was no reservation of interest to the mortgagor, but an express provision that if he defaulted in payment, or attempted to remove from the country any part of the mortgaged property, the mortgagee might take immedi-

ate possession, and before the maturity of the secured notes. The question presented was whether, as matter of law, a mortgage given by a merchant on his stock of goods to secure debts not yet due, which had no imperfections upon its face, contained no reservations for the benefit of the mortgagor, was apparently only for the security of the mortgagee, and gave him full power to take possession upon default of payment, was invalidated by a parol understanding at the time of its execution that the mortgagor might use the proceeds of his sales to support himself, and to keep up the stock by purchase, applying only the surplus to the payment of the mortgage debt; or whether such understanding was simply to be taken into consideration, with the other circumstances, as bearing upon the question of good faith. The cases of *Bank of Leavenworth* v. *Hunt*, 11 Wall. 391; *Robinson* v. *Elliott*, 22 Wall. 513; and *Means* v. *Dowd*, 128 U. S. 273, were all reviewed and distinguished, and it was held that the chattel mortgage was not necessarily invalidated by the parol agreement that the mortgagor was to retain possession with the right to sell the goods at retail, the court placing its opinion largely upon the Iowa cases, which were regarded as resting upon sound principles. See also *People's Savings Bank* v. *Bates*, 120 U. S. 556.

The principal reliance of the court below in this case was placed upon *Means* v. *Dowd*, 128 U. S. 273, 283, which was a conveyance of all the goods and personal property of the assignor to provide for the payment of certain debts, and to indemnify the endorsers upon certain notes. The instrument was variously called a " deed of trust," an " assignment," and a " mortgage." It contained an express provision that the grantors were to remain in possession of the property and continue to sell the goods for cash only, and to collect, under the direction and control of the grantees, the proceeds to be deposited in bank weekly, and applied, under the direction of the grantees, to replenishing the stock by such small bills as might be agreed upon, and to the payment of the debts of the firm in a specified order; and in case of failure to make payments, or if for any other cause the grantees might so elect, it should be lawful for them to take possession and dispose of the same

at public or private sale. This instrument was held to secure to the assignor an interest in, or an unlimited control over the property conveyed, which had the effect of hindering or delaying creditors, and to be void as being a fraud. "In the case before us," said Mr. Justice Miller, "the whole face of the instrument has the obvious purpose of enabling the insolvent debtors who made it to continue in their business unmolested by judicial process, and to withdraw everything they had from the effect of a judgment against them; for it is shown that, except the goods in this place of business transferred by the conveyance, they had nothing of value but one or two pieces of real estate encumbered by mortgage for all they were worth. It specifically provides that the grantors shall remain in possession of the said property and choses in action, with the right to continue to sell the goods and collect the debts under the control and direction of the grantees." The instrument was treated as an artful scheme to enable insolvent debtors to continue in business, in connection with the preferred creditors, at the same time withdrawing their property from the claims of other creditors which might be asserted according to the usual forms of law; and that by the mere expedient of paying interest upon the indebtedness, they had it in their power to continue in business with a large stock of goods on their shelves, and defy the unprotected creditors. The authority to take possession was accompanied by no direction for immediate sale, or winding up the business; but, on the contrary, their discretion as to taking possession and selling seemed to be absolute, and intended to be controlled for their own benefit and that of the debtors, without regard to the unsecured creditors. While the case bears a strong analogy to the one under consideration, we think it is distinguishable in the fact that there was an express provision that the mortgagors should remain in possession and continue business at the will of the mortgagees, who were given such powers as would enable the mortgagors to continue in business for their benefit, and at the same time to bid defiance to the unsecured creditors. In this case there is not only no express reservation of possession to the mortgagor, but even if

there had been, in view of the fact that such possession was immediately surrendered to the mortgagee, it is difficult to see how unsecured creditors could have been deceived or prejudiced by such reservation. In *Means* v. *Dowd*, the mortgage was not recorded, as required by law, for nearly three months after its execution, and the mortgagors were permitted for several months to control the goods and to deal with them as their own. Even when the trustees did in fact take possession, they made no change in the sign nor in the manner of conducting the business, but kept the same books by the same bookkeeper, and also employed the mortgagors to conduct the business upon a salary for them.

There can be no doubt upon this record that the deed of trust in question was made upon a valuable consideration, and for the protection of *bona fide* sureties. The clause most relied upon by the court below is the one which requires that, after payment to the beneficiaries and the expenses of the trust, the remainder should be held subject to the order of Duncan. But if it were not to be paid to Duncan, to whom should it be paid? Clearly the trustee was not entitled to retain any more for himself than was necessary for the payment of the trust and a reasonable compensation for his own services. If he had retained more than this, he might have been compelled by Duncan to account to him for such surplus. Clearly he had no right to pay it to certain of the creditors in preference to others. If he had been a general assignee for the benefit of all the creditors, he would have been obliged to pay them *pro rata;* but he was not. He was a trustee of a part — not necessarily of the whole of Duncan's property — for the benefit of certain creditors, and if any surplus were left after the payment of these creditors, it might properly be paid to the mortgagor for the benefit of the others.

Whatever may be the rule with regard to general assignments for the benefit of creditors, there can be no doubt that, in cases of chattel mortgages, (and the instrument in question, by whatever name it may be called, is in reality a chattel mortgage,) the reservation of a surplus to the mortgagor is only an expression of what the law would imply without a

reservation, and is no evidence of a fraudulent intent. This was the ruling of the Court of Appeals of New York in *Leitch* v. *Hollister*, 4 N. Y. 211, 216, where the assignment was to the creditors themselves for the purpose of securing their demands. "A trust," said the court, "as to the surplus results from the nature of the security, and is not the object, or one of the objects, of the assignment. Whether expressed in the instrument or left to implication, is immaterial. The assignee does not acquire the entire legal and equitable interest in the property conveyed, subject to the trust, but a specific lien upon it. The residuary interest of the assignor may, according to its nature, or that of the property, be reached by execution or by bill in equity." Cases in which reservations for the benefit of the assignor have been held to invalidate the assignment have usually been those where the reservation was either secret, or was upon its face detrimental to the interest of the creditors, and a practical fraud upon them. But if the reservation be only of any surplus which may chance to remain after the debts are paid, it is difficult to see why it should invalidate the instrument, as the creditors obtain all they are entitled to, and the surplus is that which as matter of law properly belongs to the mortgagor. It so rarely happens that a surplus is realized after the payment of all the debts, that courts should not be too technical in holding that the reservation of such surplus invalidates the instrument, unless it appears to have been made with fraudulent intent. If a surplus had been realized in this case, it is difficult to see what could have been done with it, except to return it to the mortgagor, in view of the fact that the trustee was not a general assignee for the benefit of all the creditors. *Dunham* v. *Whitehead*, 21 N. Y. 131; *Curtis* v. *Leavitt*, 15 N. Y. 9, 204; *Beck* v. *Burdett*, 1 Paige, 305; *Camp* v. *Thompson*, 25 Minnesota, 175; *Calloway* v. *People's Bank*, 54 Georgia, 441; *Hoffman* v. *Mackall*, 5 Ohio St. 124.

The judgment of the court below must, therefore, be

*Reversed, and the case remanded with directions to set aside the verdict, and grant a new trial.*

The CHIEF JUSTICE concurred in the result.