UNITED STATES of America, Plaintiff,

v.

VERTAC CHEMICAL CORPORATION and Hercules Incorporated, Defendants.

ARKANSAS DEPARTMENT OF POLLUTION CONTROL AND ECOLOGY, Plaintiff,

v.

VERTAC CHEMICAL CORPORATION and Hercules Incorporated, Defendants.

Nos. LR–C–80–109, LR–C–80–110.

United States District Court, E.D. Arkansas, W.D.

Sept. 9, 1987.

David Hird, Hazardous Waste Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Asst. U.S. Atty. Douglas Chavis, Little Rock, Ark., for U.S.

Phil Deisch (resigned) and Bruce Jones, Ark. Dept. of Pollution Control & Ecology, Little Rock, Ark., for Arkansas Dept. of Pollution Control and Ecology.

Allen Malone, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., Allan Gates, Mitchell, Williams, Selig Jackson & Tucker, Little Rock, Ark., for Vertac Chemical Corp.

Roxanne Jayne, Law Dept., Hercules, Inc., Wilmington, Del., Charles Schlumberger, Wright, Lindsey & Jennings, Little Rock, Ark., for Hercules, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HENRY WOODS, District Judge.

#### FINDINGS OF FACT

**I. The Corporate Structure of Vertac**

1. Vertac ceased all of its manufacturing operations at its Jacksonville site in May 1986. From June 30, 1986, Vertac's business consisted of marketing agricultural chemical products. Vertac would purchase raw chemicals, formulate them into product and sell the product. Vertac would also buy formulated product and resell it.

2. Vertac had a supply contract with Dow Chemical, U.S.A. ("Dow") under which it would purchase raw product from Dow for resale, with the latter receiving a percentage of the resale proceeds and retaining a security interest in the materials.

3. In August 1986 Phoenix Capital Enterprises, Inc. ("Phoenix") acquired 100 per cent of Vertac from three Panamanian corporations. Phoenix is owned entirely by C.P. Bomar, Jr. who is its president and sole director. Ann Pekovich is secretary of Phoenix.

4. The minutes of a meeting of the shareholders of Vertac on September 15, 1986, called to fill vacancies on the Board of Directors, disclosed that the sole shareholder in Vertac was Phoenix who executed the minutes by its president, C.P. Bomar, Jr. The secretary was J.L. Hanna. At this meeting Bomar appointed J. Randal Tomblin and Raymond A. Guidi directors.

5. Vertac employed J. Randal Tomblin to serve as president for a two-year term, succeeding Bomar, who had served from 1980 until his resignation on June 30, 1986. Tomblin has served since July 1, 1986 at a salary of $117,500 plus a directors fee of $12,000 and an incentive bonus of $25,000. The contract of employment was executed on Vertac's behalf by Bomar, as Chairman of the Board. (PX 6).

6. On July 15, 1986 the officers of Vertac were as follows:

| Name | Office |
|---|---|
| C. P. Bomar, Jr.<br>1119 Audubon Drive<br>Memphis, Tennessee 38117 | Director<br>Chairman of the Board |
| J. R. Tomblin<br>2816 Hunter Forest Drive<br>Germantown, Tennessee 38138 | Director<br>President and<br>Chief Executive Officer |
| R. A. Guidi<br>232 South Highland—Apt #805<br>Memphis, Tennessee 38111 | Director<br>Vice President of Operations |
| J. L. Hanna<br>2576 Shepherdwood Lane<br>Germantown, Tennessee 38138 | Vice President of Finance<br>and Secretary-Treasurer |
| G. T. Manley<br>5193 Longmeadow<br>Memphis, Tennessee 38134 | Vice President of Marketing |
| Anne Pekovich<br>385 North Highland—Apt #4<br>Memphis, Tennessee 38122 | Assistant Secretary |

(PX 7). Guidi retired in December of 1986.

7. In the latter part of 1986, Vertac's main offices were located in Suites 3121 and 3122 at the Clark Tower, 5100 Poplar Avenue in Memphis, Tennessee. Bomar and Pekovich, Bomar's secretary, were located in Suite 3121. The rest of Vertac's management were located in Suite 3122. Both suites were leased by Vertac. Phoenix's offices were also located in Bomar's office at Suite 3121.

## II.  Vertac's Plan to Avoid its Environmental Responsibilities

8. On October 2, 1986, Tomblin proposed a "Business Action Plan" to Bomar. Tomblin projected losses for fiscal year 1987 of $2,000,000 to $3,500,000 due in part to Vertac's environmental costs. Tomblin indicated that "it may become necessary to arbitrarily reduce spending at Jacksonville even though it will result in failure to comply with the Administrative Orders and RCRA regulations." (PX 13).

9. As part of the "Business Action Plan," Tomblin proposed to Bomar "the formation of a new marketing company to handle sales and administration of new and existing businesses." Tomblin explained:

> First pass budgetary results show a high probability of future success if the high costs of continued environmental issues at Jacksonville are not included. The separation of the business should prevent the Jacksonville environmental issues from depleting the entire financial resources [sic] of the corporation. Vertac would become the Jacksonville plant and would have to rely on the income from the Trust Fund, fees paid by the new entity for the business, Hercules contributions, and Trust Fund principle [sic].

(PX 13).

10. Bomar approved Tomblin's "Business Action Plan," on October 9, 1986. Bomar stated that:

> It will be a difficult decision to arbitrarily reduce spending if such results in Vertac's failure to comply with the Administrative Orders and the RCRA regulations. Nevertheless, if such spending is being necessitated by the previously mentioned esoteric regulations, you may have no choice but to make this decision.

Bomar also stated that Tomblin's "comments on the new marketing company ... are in line with our previous thinking and discussions." (PX 14).

## III.  The Arrangement with Dow

11. As of September 23, 1986, Vertac's debt to Dow exceeded five million (PX 12) and on November 12, 1986 Dow demanded payment in full by December 12, 1986. (PX 16).

12. In late November 1986, Bomar and Tomblin met with Jerry Ytzen of Dow. Bomar explained the concept of forming a new company and that "Vertac would essentially become a site management company for Jacksonville." (PX 18).

13. On November 25, 1985, Tomblin and Hanna met with Dow representatives. Dow expressed concern because $2 million of the $5 million owed by Vertac was unsecured and requested payment in full. Tomblin described the concept of a new company taking over Vertac's businesses. The Dow representatives said they "definitely wanted any new arrangement to be with a new company rather than with Vertac because they were concerned that any collateral they had might be lost in bankruptcy because of priority claims of the EPA." No resolution was reached at the meeting. (PX 19).

14. On December 2, 1986, Dow notified Vertac of the default in its Supply Agreement and Security Agreement and demanded payment in full of the outstanding $5.2 million debt by December 18, 1986. (PX 20 and 21).

## IV.  InterCapital and Inter–Ag

15. Bomar on December 4, 1986 incorporated InterCapital Industries, Inc. ("Intercapital") as a wholly owned subsidiary of Phoenix with Bomar as president and sole director and Hanna as secretary-treasurer. (PX 23, 24 and 24A).

16. On the same day, December 4, 1986, Bomar incorporated Inter–Ag Corporation ("Inter–Ag") as a wholly owned subsidiary of InterCapital, and Bomar was appointed as sole director. (PX 22).

17. Inter–Ag held an organizational meeting on the next day, December 5, 1986, and designated the following officers: Bomar, president; Tomblin, executive vice president; Manley, vice president; and Hanna, vice president and secretary-treasurer. Subsequently Pekovich was made assistant secretary. (PX 22 and 24).

18. InterCapital's initial capitalization was $9000; Inter–Ag's initial capitalization was $1000, which came out of the $9000 initial investment in InterCapital. (PX 22, 23 and 55). There has been no further infusion of capital into these companies by the parent Phoenix except through loans. (PX 51 and 55).

19. In addition to owning 100 percent of Inter–Ag, InterCapital owns 100 percent of Fluoropak Container Corporation and 80 percent of International Business Centers, Inc.

## V. Vertac and Inter–Ag's Relationship with Dow

20. According to notes which are made an exhibit, Bomar and Tomblin met with Dow officials on December 16, 1986 and made the following representations to them: (1) Bomar owns Vertac; (2) the Panamanians no longer have ownership involvement (actually the Panamanian corporations were the preferred stockholders of Phoenix who owned all the stock in Vertac); (3) a new company is needed to carry on the continuing business of Vertac "because of EPA problems"; (4) Inter-Ag has entered into an agreement to acquire the agricultural chemical business of Vertac and requested Dow's consent to the assignment of the contract; and (5) Inter–Ag requested certain arrangements about its debt to Dow. (PX 26).

21. Dow was not satisfied by the December 16 meeting and on December 18 demanded payment in full. (PX 28).

22. Bomar and Tomblin continued to propose that Dow enter into a supply agreement with Inter–Ag, and on December 19, Bomar proposed to Dow that it supply product to Inter–Ag on the same terms as Vertac, pending assignment of the supply contract from Vertac to Inter–Ag. (PX 29 and 30).

23. On December 23, 1986, Dow notified Vertac that its supply agreement was terminated effective December 24. (PX 31 and 32).

24. On December 31, 1986, Bomar resigned as chairman of the board of Vertac, but continued as president and sole director of Vertac's parent, Phoenix. In his letter of resignation, Bomar stated that without an income stream, "Vertac could be insolvent in a matter of a month or so." Bomar further stated that Dow might continue as a supplier "if the contract were transferred to a company which did not have the potential for the EPA to strip away the ability to pay." Bomar concluded that he had "formed Inter–Ag Corporation to carry on the business and will begin to function immediately as President of Inter–Ag." (PX 33).

25. Bomar continued to occupy and operate out of Suite 3121 at 5100 Poplar Avenue in Memphis, located next door to Vertac's management offices and leased by Vertac. Pekovich, a Vertac employee, continued as his secretary.

## VI. Developments at Jacksonville Site

26. Tomblin attended a meeting in Dallas on January 22, 1987 with representatives of EPA, the Department of Justice, ADPC & E, and Hercules. At this meeting Tomblin gave the attendees the following letter:

> Pursuant to Paragraph 3 of the Agreement between Hercules, ADPC & E, and Vertac entered into in connection with the Remedial Action Plan approved by Order of the United States District Court for the Eastern District of Arkansas dated July 18, 1984, in Consolidated Cases Nos. LRC–80–109 and 110, this is to notify you that Vertac's financial resources are insufficient to permit Vertac to continue to carry out the Remedial Action

Plan at the Jacksonville Plant after Sunday, February 1, 1987.

This notice has become necessary as a result of ADPC & E's refusal to approve reimbursement of unexpectedly high drum maintenance costs out of the $6.7 million Trust Fund established last June. In addition, the Company's principal supplier unexpectedly, and we believe illegally, terminated a favorable contract, thereby eliminating Vertac's principal source of revenues and profits in the months ahead.

Vertac personnel will cooperate with you and with EPA representatives in every way possible to assure an orderly transition and to prevent any interruption in the operation and maintenance of the leachate collection and treatment system and in the continued safe hanadling of drummed wastes on the Jacksonville Plant site.

(PX 36).

27. No mention was made at the January 22 meeting of Inter–Ag or of a transfer of assets from Vertac to a related company.

28. Upon being notified of Vertac's abdication of its responsibilities at the Jacksonville site, EPA advised that it would take over management of the on-site wastes and Hercules assumed responsibility for the leachate collection system.

29. On January 24, 1987, EPA response personnel were on the Jacksonville site to examine the situation and develop a work plan. A full response team was assembled on site on January 28.

30. On January 30, 1987, Allyn Davis of EPA wrote to Tomblin notifying him that Vertac could be legally responsible for the costs expended by EPA on the site. (PX 37).

31. On February 1, 1987, Vertac abandoned the Jacksonville site. Vertac laid off all of its on-site employees except one, Jerry Hamilton, an administrative employee with no environmental responsibilities. Hamilton left Vertac on June 30, 1987.

32. On February 1, 1987, EPA began taking over management of the on-site wastes and Hercules took over operation of the Leachate collection system.

## VII. The New Arrangement between Inter–Ag, Dow and Vertac as Set Forth in Agreements of February 9 and 10

33. On January 29 and 30, 1987, Bomar and Tomblin met with Dow in Midland, Michigan and worked out the basis of an agreement under which Dow would transfer its supply agreement from Vertac to Inter–Ag. (PX 38).

34. On February 9, 1987, Vertac entered into an agreement with Inter–Ag under which Vertac sold to Inter-Ag inventory, furniture and equipment, and intangible assets. The intangible assets included: pesticide registrations and labels, patents, trademarks, contract rights, scientific data, product formulas, customer lists and goodwill. The Jacksonville plant site remained with Vertac. The sale price was $1,675,000, of which $800,000 was to be paid immediately and $875,000 was to be paid on May 31. (PX 44).

35. Neither payment was to be made to Vertac; instead, both payments were to be made on behalf of Vertac to Dow. (PX 44).

36. As part of the February 9 transaction, Inter–Ag assumed Vertac's obligations under its lease for Suites 3121 and 3122 at 5100 Poplar Avenue, Vertac's contract with Falls Chemical, Inc. to operate a formulating plant and Vertac's obligations to fill outstanding orders from its customers. (PX 44).

37. The inventory sold by Vertac to Inter–Ag accounted for 30 percent of Vertac's total inventory, and included all of Vertac's inventory which was not subject to a security interest in favor of Dow, except certain inventory located on the Jacksonville site. All of the inventory which was subject to Dow's security interest was returned to Dow the next day, and then immediately resold to Inter–Ag.

38. The February 9 transaction constituted a sale of all of Vertac's assets necessary to conduct an agricultural chemicals marketing business and a transfer of those

obligations to allow uninterrupted continuation of that business.

39. Tomblin signed the February 9 agreement as president of Vertac; at the same time, he was executive vice president of Inter–Ag. (PX 44).

40. Bomar signed the February 9 agreement as president of Inter–Ag. At the same time, Bomar was president, sole director and controlling shareholder of Phoenix, the parent company to both Vertac and Inter–Ag. As president and sole director of Phoenix, Bomar on February 7, 1987 ratified the decision of the Vertac directors to enter into the February 9 agreement with Inter–Ag. (PX 40, 41 and 44).

41. No independent appraisal had been made of the assets sold by Vertac to Inter–Ag.

42. The February 9 transaction was not an arm's length transaction.

43. Prior to the February 9 transaction, Tomblin projected that Inter–Ag would have a pre-tax profit of $1,696,000 for January through June 1987 and of $2,042,000 for July 1987 through June 1988. Shortly after the transaction, in the latter part of February, Hanna, Vertac's and Inter–Ag's accountant, projected that Inter–Ag would have a pre-tax profit of $1,523,000 for February through June 1987. (PX 25; DX 1).

44. Using Tomblin's projections, Alexander Skirpan, a certified public accountant, testified that an investor in Inter–Ag would expect to receive a return of 110 percent over 20 years on an initial investment in Inter–Ag of $1,675,000. (PX 25). Mr. Skirpan further testified that a return of 18 percent would be the upper end of the return which a reasonable investor would expect to receive from an investment in a chemical company. (PX 121).

45. The February 9 transaction was not a sale for fair market value because it was not an arm's length transaction and because the Inter–Ag principals expected to recoup the $1,675,000 initial investment from the profits of the first six months of Inter–Ag's operations. (PX 25).

46. As of February 10, 1987, Vertac owed Dow approximately $5.3 million.

47. On February 10, 1987, Vertac and Inter–Ag entered into an agreement with Dow. Under this agreement: (1) Vertac returned to Dow $2.9 million in collateral (consisting of $1,890,000 in Product and $1,010,000 in accounts receivable); (2) Inter–Ag purchased the return $2,900,000 in product at full cost; (3) Inter–Ag agreed to pay to Dow on Vertac's behalf the $1,675,-000 it owed Vertac as part of the February 9 transaction ($800,000 was paid at closing and $875,000 was due on May 31); (4) Vertac gave Dow a note for $572,000, payable in installments of $50,000 a month beginning June 30; (5) Vertac gave Dow new security to cover that note (the new collateral consisted of the interest payments from Vertac's Trust Fund and the uncontaminated equipment at the Jacksonville site); and (6) Dow assigned its supply agreement with Vertac to Inter–Ag on condition that Inter–Ag agree to guarantee Vertac's repayment of the $572,000 note. (PX 45).

48. The February 10 agreement would provide for payment of close to 100 percent of Vertac's debt to Dow.

49. Phoenix, Inter–Ag's parent, provided Inter–Ag the funds necessary to conclude the Dow transaction and obtain a supply agreement. Phoenix was also Vertac's parent.

50. Between the sale of inventory from Vertac to Dow on February 9 and the return of inventory from Vertac to Dow on February 10, Vertac transferred over 90 percent of its inventory.

51. In the February 10 agreement, the parties agreed that the agreement would not be invalid if there were a violation of any applicable Bulk Sales Act. (PX 45, Schedule C).

52. The February 9 and 10 transactions were both transactions out of the ordinary course of Vertac's business.

53. No prior notice of the February 9 and 10 transactions was given to the United States, the State of Arkansas or any other of Vertac's creditors, except Dow.

54. Vertac, its owners and its management intended through the February 9 and 10 transactions to place Vertac's assets and

businesses where they would not be subject to the environmental claims of the United States and the State of Arkansas.

55. Vertac, its owners and its management intended through the February 9 and 10 transactions to defraud, hinder and delay the United States and the State of Arkansas in satisfying their environmental claims.

56. Following the February 10 transaction, Bomar and Tomblin met with the Vertac headquarters staff in Memphis and informed them that they would no longer have jobs in Vertac, but offered each of them the same positions in Inter–Ag, and each of them accepted. Hanna, Manley and Pekovich assumed the same positions as officers of Inter–Ag which they had held as officers of Vertac. Bomar instructed the office staff to answer the phone "Vertac/Inter–Ag." (PX 46). As of February 11, the only Vertac employees were Tomblin in Memphis, Hamilton in Jacksonville and an office assistant in Memphis who left by the end of February.

57. Bomar and Tomblin agreed that Tomblin would be assigned duties as executive vice president of Inter–Ag and that Inter–Ag would reimburse Vertac for 25 percent of his salary. (PX 47 and 49).

58. Inter–Ag began on February 12 to market the same agricultural chemicals as Vertac had, using the same trademarks and trade names, and employing the Vertac marketing and administrative staff. Vertac announced to its customers and suppliers that Inter–Ag would fill any outstanding customer orders from Vertac. (PX 48 and 53).

59. Bomar operated Phoenix, InterCapital and Inter–Ag all out of the same office, Suite 3121, 5100 Poplar Avenue in Memphis, from which he used to operate Vertac. Bomar, on his sole authority was able to authorize instantaneous loans from Phoenix to InterCapital, and InterCapital to Inter–Ag without obtaining any written approval by others or executing any loan agreements. (PX 51).

60. On May 5, 1987, Inter–Ag and Bomar, on behalf of Vertac, pre-paid the $875,000 due to Dow on May 31. The payment was made at a discounted rate of $871,500. The payment was made two days before a court hearing was scheduled on the plaintiffs' motion for a temporary restraining order against Vertac. (PX 59 and 60).

61. The first $50,000 installment on Vertac's $572,000 note to Dow was due on June 30, 1987. Inter–Ag paid the installment on behalf of Vertac.

## VIII. EPA Activities on the Jacksonville Site

62. When Vertac abandoned the Jacksonville site, there were over 28,000 drums of 2,4,5–T and 2,4–D on the site and 194 bulk storage tanks, containing a variety of waste material, including 2,4–D, 2,4,5–T and 2,3,7,8–TCDD (dioxin). (PX 93). There were also over 900 boxes of contaminated trash on site. Drums were stacked three high with the imposing weight of the upper two tiers affecting the integrity of the drums on the lower tier. Many drums were left out in the open where the heat of the day could affect the exterior of the drum and lead to sooner drum failure. Both drums and bulk storage tanks were leaking. The waste in the drums has corroded the drums and is continuing to corrode the drums.

63. Some drums on the site are marked "T" for 2,4,5–T, and others are marked "D" for 2,4–D. However, many of the markings are indistinguishable and unreliable. Some drums are marked both "T" and "D." The drums which contain 2,4,5–T also contain the impurity 2,3,7,8–TCDD (dioxin). The drums which contain 2,4–D, contain waste material from manufacturing equipment that was used to produce both 2,4,5–T and 2,4–D. A batch of 700 of the 2,4–D drums was sampled by Vertac in 1980 and was found to contain 20 parts per billion of 2,3,7,8–TCDD (dioxin). (PX 208).

64. There are about 38 buildings on the site. Visual contamination was found in all but a few of them, but testing is necessary before the absence of contamination may be confirmed. (PX 86a-u). The structural integrity of many of the buildings was fail-

ing. Drums were found in almost all the buildings. One building was found to be filled with spent carbon. The base of a building known as the "D shed" containing drums of 2,4–D was exposed and deteriorating due to erosion.

65. Since February 1 and the date of trial (July 27), EPA has redrummed or overpacked approximately 6000 leaking drums. EPA has instituted an inspection regime under which each of the more than 28,000 drums is inspected over a two day period, and all leaking drums are identified and redrummed. EPA performs this inspection two or three times a week. In the summer months EPA has been redrumming as many as 500 to 600 drums a week.

66. EPA has constructed two new drum warehouses the size of football fields and has placed 5400 drums in each, stacked two high. The warehouses include a floor and roof to protect the drums from the weather, and are curbed to catch any spilled material. EPA has prepared two concrete pads for storage of additional drums and has purchased greenhouse covers for both pads to protect the drums from the elements. One greenhouse cover was being erected during the trial. (PX 99a).

67. EPA moved all the drums which Vertac had stored in the east storage area because that area was subject to storm-water runoff which could spread the contamination. EPA has lowered most of the drums which Vertac left stacked three high.

68. EPA has completed an inventory of all bulk storage tanks. (PX 93). EPA has patched leaking bulk storage tanks and in one instance, where an existing tank could not be saved, EPA replaced it with a new tank and pumped material from the old tank into the new tank.

69. EPA curbed the "D shed," containing drums labeled "D," so that its base would not further deteriorate and any leaked or spilled material would be caught before reaching the soil. EPA also curbed storage pads found on the site to catch any spills or leaks. EPA implemented erosion control measures, including irrigation trenching and reseeding, so that runoff could not spread contamination.

70. EPA provided 24–hour site security. EPA hired layed-off Vertac employees to work as security guards.

71. EPA identified contamination in the buildings and pipes. EPA took soil samples in areas of the site which it expected to be clean and identified three hot spots of dioxin contamination. EPA has not yet taken soil samples in the central manufacturing area where the contamination may be greater. .

72. The EPA response team has currently authorized a ceiling of $4.67 million on these activities, approved by EPA headquarters and EPA Region VI. (PX 94, 95 and 96). As of July 9–13, 1987, EPA's expenditures were $2,387,493. (PX 87a-d, 88a-e, 89 and 90).

## IX. Hercules Activities on the Jacksonville Site

73. Since February 1, 1987, Hercules has been operating the leachate collection system which is part of the 1984 court-approved remedy. Hercules' expenses are running approximately $60,000 a month. (PX 213; Frawley deposition p. 45).

## X. Vertac's Activities on the Jacksonville Site

74. Prior to February 1, 1987, Vertac failed to properly maintain the drums and other wastes on the site in accordance with a Consent Administrative Order which it signed with ADPC & E on February 28, 1986. (PX 4). Vertac failed to adequately maintain the drums from leaking and to address leaking drums. Vertac failed to identify all of the leaking drums. Vertac stacked drums three high where the imposing weight of the upper tiers could weaken the integrity of the lower tiers. Vertac failed to maintain adequate aisle space to allow for inspection. Vertac failed to submit the required reports to ADPC & E; Vertac failed to submit a revised closure plan for the site to ADPC & E. (PX 100, 101a-kkkk, 160, 162 and 164.

75. From June 30, 1986 to date, Vertac spent $1,092,501, including overhead, on

managing drummed waste at the Jacksonville site. (PX 176). Vertac ceased all drum management activities as of February 1, 1987.

76. Hercules and Vertac had an agreement to share on an equal basis the costs of the operation of the leachate collection system in 1986. An accountant for Hercules examined Vertac's books and determined that a 50 percent share of the operating costs for 1986 was $237,000 and Hercules paid that amount to Vertac. Therefore, Vertac's cost of operating the Leachate collection system from June to December 1986 was $118,650. (PX 27). Vertac only operated the leachate collection system for an additional month, January 1987.

77. Vertac had no other environmental expenditures within the meaning of the Stipulation of July 15, 1986 between June 30, 1986 and the present. Depreciation, expenses of Vertac's Memphis office, and payments of lawyers' fees are not the type of environmental expenditures provided for in the Stipulation. Vertac discontinued its efforts to develop a new Jacksonville closure plan in early 1987. (PX 165).

## XI. Estimated Remedial Costs

78. ADPC & E has issued a request for proposal from contractors for the incineration of the drums and possibly other wastes at the Jacksonville site. The United States, the State and Vertac consider incineration the preferable method of disposing of the drums. (PX 110, 158, 162 and 175).

79. Gergory Peterson, an environmental engineer with experience working on dioxin hazardous waste sites, employed by CH2M Hill, a firm that is not bidding on the ADPC & E's contract, provided an estimate of the costs of incinerating the drums, bulk storage tanks, trash containers and spent carbon on the Jacksonville site and storing the ash and brine resulting from the incineration. At the lower range of the scale, this estimate would be $11.2 million. If costs are included for a test burn, permitting waste handling and concentration of the brine, the more realistic figure would be $17.1 million. (PX 110).

80. Mr. Peterson further estimated that the costs of decontaminating, demolishing and disposing of the contaminated buildings and tanks on site would be $9.9 million. (PX 110).

81. Mr. Peterson proposed three approaches to the problem of contaminated soil and paving in the manufacturing areas and provided cost estimates for each. The first approach was to install a minimal cap; the second to install a RCRA cap; and the third was to incinerate contaminated soil to a depth of six inches and install a RCRA cap. Each of these scenarios included the costs of decontaminating the buildings and tanks and a remedial investigation/feasibility study to determine the extent of soil contamination. Mr. Peterson estimated a cost of $17.6 million for the minimal cap scenario, of $21.9 million for the RCRA cap scenario, and of $48.6 million for the scenario which involved incineration of soil and a RCRA cap. (PX 110).

82. Mr. Peterson testified that at present there is insufficient information to estimate the costs of remedying contaminated piping, subsurface soil and buried materials. (PX 110).

83. EPA prepared a remedial investigation/feasibility study of the off-site areas in the vicinity of the Jacksonville plant site. The feasibility study was completed in June 1986 and a copy was sent to Vertac on June 23, 1986. (PX 146, 147 and 214).

84. The remedial investigation found dioxin contamination at the old Jacksonville publicly owned treatment works ("POTW"), in Rocky Branch and Bayou Meto and in the floodplain. EPA identified several remedial alternatives, including: no action, restricting access and monitoring, in place containment, local incineration and nonlocal incineration, local disposal and nonlocal disposal. Cost estimates for alternatives for the waterways and floodplain (other than for the no action alternative) ranged from $1.6 million (for monitoring and restricting access) to $240 million (for local incineration). For the POTW, cost estimates for alternatives other than no action ranged from $1.9 million (for monitoring and restricting access) to $140 mil-

lion (for local incineration). No remedial decision has been reached and other alternatives may be considered. (PX 146 and 147).

85. Hercules has estimated that maintenance costs for the remedy approved by the court in 1984 for the burial areas on-site over 30 years will be $10 million. Hercules has also determined that capital improvements will be needed in connection with the 1984 remedy, but has not estimated those costs. (PX 213 (Frawley deposition at pp. 45–46)).

86. Mr. Peterson testified that there is a significant risk that the 1984 remedy for the burial areas may fail to work over time and additional costs may be incurred to investigate conditions and implement another remedial alternative.

87. The costs of maintaining the drums, tanks and other waste materials at the Jacksonville site were reasonably foreseeable as of June 30, 1986. The costs of incinerating drums, trash, bulk liquids and spent carbon at the Jacksonville site as well as decontaminating and demolishing the buildings and tanks and remediating contaminated soil in the manufacturing areas were reasonably foreseeable as of June 30, 1986. The costs of remediating off-site areas as well as the costs of operating and maintaining the 1984 remedy for burial areas were also reasonably foreseeable as of June 30, 1986. These costs exceed Vertac's assets net of its book liabilities as of June 30. (PX 2, 4, 110, 134, 146, 147, 179 and 214).

## XII. Vertac's Financial Condition

88. Vertac was indebted to the United States and ADPC & E as of the February 9, 1987 Inter–Ag transaction by virtue of their status as judgment creditors under the Consent Decree and Stipulation previously entered by this court in this action. As of the time of the Inter–Ag transaction, Vertac was also indebted to the United States for response costs incurred by EPA in undertaking Vertac's duty, under the Consent Decree, to manage and maintain drums stored on Vertac's Jacksonville site.

89. As of January 31, 1987, and throughout the month of February, 1987, Vertac was insolvent in that its liabilities were in excess of its assets at fair valuation. Alexander Skirpan, a certified public accountant, testified that Vertac's unaudited financial statements dated January 31, 1987, listed no amounts for environmental liabilities, while at the same time carrying as an asset a $7 million Trust Fund established in recognition of Vertac's environmental liabilities. (PX 62 and 120). Mr. Skirpan testified that, to determine solvency, it was necessary to assume a liability of some amount if the Trust Fund were to be considered an asset.

90. Mr. Skirpan further testified that Vertac's plant and equipment were reported in its January 31, 1987, financial statements at an amount in excess of $6 million. (PX 62). Vertac, in its Responses to the United States' Interrogatories, stated that the plant and equipment had a fair value of only $500,000. (PX 210). An internal company memorandum dated June 11, 1986, had valued the plant and equipment at a high of $650,000 and at a low of no value. (PX 5a). Given these valuations and the fact that Vertac discontinued its business operations in May, 1986, Mr. Skirpan stated that it was appropriate to write-down the value of those assets.

91. If Vertac's assets are revalued in accordance with the internal company memorandum, and the Environmental Trust Fund is included as asset at $7 million, an environmental liability of approximately $6.4 million would cause Vertac's liabilities to exceed its assets as of January 31, 1987. (PX 51, 62 and 120). Based on the evidence of the estimates of remedial costs necessary to address both on-site and off-site contamination, Vertac was insolvent as of January 31, 1987, in that its liabilities were in excess of its assets at fair valuation.

92. Vertac was also insolvent as of January 31, 1987, in that the fair value of its assets was less than the amount required to pay its probable liabilities on its existing debts as they became absolute and matured. Mr. Skirpan testified that Vertac's

current liabilities exceeded its current assets as of January 31, 1987. (PX 62 and 120). An excess of current liabilities over current assets is an indication of an inability to pay debts as they become due and thus an indicator of insolvency. Mr. Skirpan testified that the transfer by Vertac of its only remaining on-going operations to Inter–Ag effectively locked in this cash-poor financial condition, thereby precluding Vertac from regaining any financial viability.

93. Bomar and Tomblin knew of Vertac's indebtedness to the United States and ADPC & E at the time the proceeds of the Inter–Ag transaction were paid to Dow Chemical Corporation. Dow Chemical Corporation also knew of Vertac's indebtedness to the United States and DPC & E at the time it received the proceeds of the Inter–Ag transaction. These individuals and corporations were all aware that Vertac's assets were insufficient to satisfy its probable environmental liabilities associated with the Jacksonville site. (PX 2, 13, 14, 18, 33 and 45).

94. The assets associated with the business transferred to Inter–Ag by Vertac were not subject to any security interest in favor of Dow Chemical Corporation or any other third party. (PX 44).

95. Vertac voluntarily assigned the proceeds of the Inter–Ag transaction to Dow Chemical Corporation. These proceeds were not subject to any security interest in favor of Dow or any other third party. (PX 44 and 45).

96. Bomar, Tomblin and Inter–Ag made three payments on behalf of Vertac to Dow at times when Vertac was insolvent and indebted to the United States: a payment of $800,000 on February 10, 1987, a payment of $871,500 on May 5, 1987 and a payment of $50,000 in July 1987. (PX 44, 45, 59 and 60).

97. Phoenix intends to file a consolidated income tax return with its subsidiaries, including Vertac, Inter–Ag and InterCapital. This would allow Phoenix for tax purposes to offset the losses and liabilities of Vertac against the profits of its other subsidiaries.

98. Inter–Ag earned a pre-tax profit of $475,000 between February 10 and April 30, 1987, and an estimated $800,000 pre-tax profit from February 10 to June 30. (PX 68).

99. Following the February 9 and 10 transactions, Vertac has no on-going business operations. Vertac currently has only one employee, Tomblin. Vertac's only source of income is the interest on the Environmental Trust Fund, which is running approximately $70,000 a month.

100. Tomblin testified that as president of Vertac, he had no intention of making any further expenditures on environmental matters, except to pay certain bills from past suppliers of equipment. Tomblin knew of no present intention by Vertac's shareholder of investing more capital into Vertac for the purposes of meeting Vertac's environmental obligations.

## CONCLUSIONS OF LAW

### I. Vertac's Violations of the Consent Decree

1. A Consent Decree was entered in this action on January 18, 1982. (PX 1). A consent decree is a judgment. *See Monsanto Co. v. Ruckelshaus,* 753 F.2d 649, 653 (8th Cir.1985); *United States v. Jefferson County,* 720 F.2d 1511, 1517 (11th Cir.1983). In the Consent Decree, defendant Vertac undertook certain obligations to the United States and the ADPC & E; accordingly, the United States and the ADPC & E are Vertac's judgment creditors.

2. Under paragraph IX of this Consent Decree, Vertac agreed to: (1) manage the chemical wastes on site until ultimate disposal in accordance with the requirements of the Resource Conservation and Recovery Act ("RCRA"); and (2) dispose of the chemical wastes on site. Paragraph IX(E) provided that nothing contained in the Consent Decree shall affect or modify any responsibilities or duties which may be imposed upon Vertac under RCRA, the Toxic Substances Control Act ("TSCA"), the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), Arkansas Act 406 of 1979, and regu-

lations thereunder. (PX 1; Consent Decree, paragraph IX).

■ 3. Vertac violated paragraph XI of the Consent Decree by failing to properly care for the wastes on the Jacksonville site, by abandoning the Jacksonville site on February 1, 1987 and ceasing to undertake any efforts to manage the wastes on the site thereafter.

4. The Consent Decree also provided in paragraph XII that Vertac shall maintain all remedial actions taken pursuant to Orders of the Court for a period of 30 years following closure of Vertac's Jacksonville plant as a manufacturing facility. (PX 1). Consent Decree, paragraph XIII. After a hearing in 1984, this Court ordered that certain remedial actions be taken in the burial areas on the Jacksonville site.

5. Vertac violated paragraph XIII of the Consent Decree by failing as of February 1, 1987 to continue to operate and maintain the leachate collection system as part of the 1984 remedy ordered by the Court.

6. The Consent Decree preserved the plaintiffs' claims against Vertac, and defendant Hercules, Inc. for remedial measures with respect to off-site areas. (PX 1). Consent Decree, paragraphs IX(F), X(C) and XIV. This hearing was not intended to resolve those claims, or any other claims which plaintiffs may have against Hercules. Similarly, Hercules has not waived any defenses that it may have against plaintiffs' claims.

## II. Vertac's Violations of the Stipulation of July 15, 1986

■ 7. On July 15, 1986, this Court entered a Stipulation among the United States, ADPC & E and Vertac. Under the terms of the Stipulation, the United States and ADPC & E agreed not to challenge the spin-off of certain Vertac businesses into a separate company upon Vertac's agreement to provide certain financial assurances that Vertac would meet its responsibilities under the Consent Decree. Under the Stipulation, Vertac and its shareholders at the time agreed to do the following:

(a) Vertac would place an additional $6,700,000 in an existing Environmental Trust Fund to address current and future environmental obligations at the Jacksonville site. At this point, the principal in the Trust Fund is $7,000,000 and there is an additional $500,000 in a separate RCRA trust fund. Under the terms of the Stipulation establishing the main Environmental Trust Fund, monies from the Fund could be used for the costs of disposal and/or treatment of the drummed wastes, for extended storage of the wastes, for plant closure, and for off-site remediation. The Trust Fund further provided that a minimum of $2,200,000 be applied to treatment or disposal of drummed wastes, and a minimum of $1,000,000 be applied to off-site remediation. No funds may be expended without the approval of the ADPC & E. (PX 2, Stipulation (Trust Agreement attached)).

(b) Vertac's shareholders agreed to advance to Vertac $3,150,000 and Vertac agreed to spend at least the same amount on environmental costs of the same type as those for which Trust Fund monies could be used. (PX 2, Stipulation (Addendum attached)).

(c) Vertac's shareholders further agreed to place $4,000,000 in a letter of credit and that plaintiffs may petition the Court to order the release of up to that amount from the letter of credit if "Vertac's liability for environmental costs and expenses related to Vertac's operations and/or ownership of the Jacksonville plant which were reasonably foreseeable as of" June 30, 1986 "exceed the value of Vertac's assets net of its book liabilities as of" June 30, 1986. (PX 2, Stipulation (Agreement attached)).

(d) Vertac agreed that "the remaining assets [of] businesses retained by Vertac following the Spin-Off" would be available "for Vertac to meet its environmental responsibilities." The monies in the Environmental Trust Fund, the letter of credit and the additional $3,150,000 were intended to provide financial assurance, but not intended to establish the limit of Vertac's environmental liabilities. (PX 2, Stipulation (Agreement attached)).

7. By transferring its assets and businesses to Inter–Ag in an effort to put them beyond the reach of the United States and ADPC & E, Vertac violated the requirement of the Stipulation that its retained assets and businesses will be available to provide funds to meet its environmental responsibilities.

8. Vertac has violated its obligation in the Stipulation to spend at least $3,150,000 on environmental costs.

■ 9. Vertac's liability for environmental costs and expenses related to Vertac's operations and ownership of the Jacksonville plant (which were reasonably foreseeable as of June 30, 1986) exceed the value of Vertac's assets net of its book liabilities as of June 30, 1986. Under the terms of the Stipulation, the United States and ADPC & E are entitled to access the Vertac shareholder letter of credit established under the Stipulation for the full value of $4,000,000 to be used to satisfy Vertac's environmental obligations.

### III. Vertac's Violations of the Consent Administrative Order

■ 10. On February 28, 1986, Vertac entered into a Consent Administrative Order with ADPC & E concerning the management of the drummed wastes on the Jacksonville site. (PX 4). Vertac violated that Consent Administrative Order by stacking the drums three high and failing to maintain adequate aisle space between pallets of drums to allow for inspection. Vertac further violated the Consent Administrative Order by abandoning the site and the drummed waste on February 1, 1987 and failing to submit a revised closure plan for the site. (PX 100, 101a-kkkk, 160–164).

### IV. Vertac is liable to the United States and ADPC & E under RCRA for Past and Future Response Costs

#### A. Vertac's Liability Under Section 7003 of RCRA

11. This court has previously determined that Vertac is liable under section 7003(a) of RCRA, 42 U.S.C. § 6973(a) as a person who contributed to the handling, storage, treatment, transportation, and disposal of hazardous waste which may create an imminent and substantial endangerment to health or the environment.

■ 12. The drums, bulk storage tanks, trash boxes, buildings, pipes and soil on the Jacksonville site contain 2,4,5–T waste, and 2,4–D waste from manufacturing operations involving equipment previously used for the manufacture of 2,4,5–T. Accordingly, these wastes are listed as F020 and F023 acutely hazardous wastes under sections 1004(5) and 3001 of RCRA, 42 U.S.C. §§ 6903(5) and 6921, and 40 C.F.R. § 261.-31. The materials in the drums and tanks are also hazardous wastes under section 3001 of RCRA and 40 C.F.R. § 261.22 because they exhibit the characteristic of corrosiveness.

13. Section 7003(a) of RCRA provides an equitable right for the government to seek reimbursement of costs it has incurred responding to conditions of imminent and substantial endangerment. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 749 (8th Cir.1986); *United States v. Price*, 688 F.2d 204, 213–14 (3d Cir.1982).

■ 14. The United States has incurred costs of at least $2,387,493, managing the drums and other wastes on the Jacksonville site and is intending to continue to incur costs in the future until the ultimate disposal of the wastes. (PX 87a–e, 88a–e, 89, 90, 94, 95 and 96). Vertac is liable under section 7003 of RCRA for the costs spent by the United States to date and for the future expenditures by the United States in managing the wastes.

15. The State is undertaking efforts to obtain a contract for the ultimate disposal of at least the drums, and perhaps other wastes, on the Jacksonville site. The United States may also incur costs supporting the State's efforts. (FF 84). To the extent the United States and the State incur costs providing for the Ultimate disposal of the wastes on the Jacksonville site, those costs are recoverable from Vertac under section 7003 of RCRA.

## B. Vertac's Liability under Section 107(a) of CERCLA

16. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that the United States or a State may recover all costs of removal or remedial action incurred, not inconsistent with the National Contingency Plan, in responding to a release or threatened release of hazardous substances from a facility. These costs may be recovered from the current owner and operator of the facility under section 107(a)(1) and from the owner and operator of the facility at the time of disposal of the hazardous substances under section 107(a)(2). *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2d Cir.1985); *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 186–87 (W.D.Mo.1985); *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1115 (D.Minn.1982).

17. The term "facility" is defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9), to include any "storage container" and "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." The courts have read this definition broadly. *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743 (8th Cir.1986); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n. 15 (2d Cir.1985). The Jacksonville site is a facility under CERCLA; moreover, because each of the drums, bulk storage tanks and trash boxes on site is a storage container, each is also a facility under CERCLA.

18. The term "hazardous substance" is defined under section 101(14) of CERCLA, 42 U.S.C. § 9601(14), to include any waste which is listed as hazardous under section 3001 of RCRA or which has the characteristics of hazardous waste identified under section 3001 of RCRA, including corositivity. Because the wastes on the Jacksonville site are hazardous wastes under RCRA, they are also hazardous substances under CERCLA.

19. The term "hazardous substance" is further defined in section 101(14) of CERCLA, 42 U.S.C. § 9601(14), to include substances specifically designated as hazardous substances under section 102 of CERCLA, 42 U.S.C. § 9602. Under section 102, EPA has promulgated a list of hazardous substances at 40 C.F.R. § 302.4. That list includes 2,4–D, 2,4,5–T and 2,3,7,8–TCDD (dioxin), which have been found in the drums, tanks and buildings on the Jacksonville site. (FF 65 and 66).

20. The term "release" is defined in section 101(22) of CERCLA, 42 U.S.C. § 9601(22), to include "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." The leaking and corroding drums and bulk storage tanks on the Jacksonville site, and the contaminated buildings, pipes, trash boxes and soil, all demonstrate past releases and threatened future releases of hazardous substances into the environment.

21. Vertac is liable under section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), as the current owner and operator of a facility from which there have been releases and threatened releases of hazardous substances.

22. Vertac is liable under section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), as the owner and operator of a facility at the time when hazardous substances were disposed of at that facility.

23. The United States has incurred removal costs of at least $2,387,493 in responding to releases and threatened releases of hazardous substances at the Jacksonville site and is intending to incur additional removal costs until ultimate disposal of the wastes at that site. Under Section 101(23) of CERCLA, 42 U.S.C. § 9601(23), "removal" is defined to include "cleanup or removal of released hazardous substances from the environment," actions "to monitor, assess and evaluate the release or threat of release of hazardous substances," and "such other actions as may be necessary to prevent, minimize, or mitigate damage to public health" or "the environment."

24. The costs incurred by the United States and the costs which the United States continues to incur in managing the Jacksonville site and its hazardous substances are consistent with the National Contingency Plan, adopted under section 105 of CERCLA,, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300. Specifically, these costs were incurred consistently with 40 C.F.R. § 300.65, the portion of the National Contingency Plan relating to removals. (PX 87a–d, 88a–3, 89, 90, 94, 95 and 96).

25. As the Eighth Circuit ruled, "the choice of a particular cleanup method is a matter within the discretion of the EPA," and may only be overturned if the choice is arbitrary and capricious. *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 748 (8th Cir.1986). There has been no showing that the actions of the United States in managing the hazardous substances at the Jacksonville site were arbitrary or capricious.

26. All costs incurred by the United States consistent with the National Contingency Plan are "conclusively presumed to be reasonable." *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 748 (8th Cir.1986). Vertac is liable to the United States for the costs which it has incurred to date managing the hazardous substances at the Jacksonville site and for the future costs of continuing to manage these hazardous substances until ultimate disposal.

27. The ADPC & E is undertaking to enter into a contract to ultimately dispose of drummed wastes and perhaps other hazardous substances at the Jacksonville site. The United States may support that contract. (FF 81). To the extent ADPC & E or the United States incurs costs in that effort, Vertac is liable to them for those costs under section 107(a)(1) & (2) of CERCLA, 42 U.S.C. § 9607(a)(1) & (2), as remedial costs. Under section 101(24) of CERCLA, 42 U.S.C. § 9601(24), "remedial action" is defined to include "those actions consistent with permanent remedy" of releases of hazardous substances "so that they do not migrate to cause substantial danger to present or future public health" or "the environment."

## V. Inter–Ag is Liable to the United States and ADPC & E as Vertac's Corporate Successor

### A. Introduction

28. Paragraph III of the Consent Decree provides that the Consent Decree shall "be binding ... upon the officers, agents, receivers, trustees, successors and assigns of the parties." (PX 1: Consent Decree, paragraph III). Accordingly, the Consent Decree is binding on any successor corporation to Vertac.

29. There are four generally accepted situations in which a corporation that purchases the assets of another corporation will succeed to its liabilities:

- When the purchasing corporation expressly or implicitly agreed to assume the seller's liabilities;

- when the transaction amounts to a consolidation or merger of the purchaser and seller corporation;

- when the purchaser corporation is merely a continuation of the seller corporation;

- when the transaction is fraudulent.

*Tucker v. Paxson Machine Co.,* 645 F.2d 620, 622 (8th Cir.1981); *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 308–09 (3d Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1456 (11th Cir.1985); *Dayton v. Peck, Stow and Wilcox Co.,* 739 F.2d 690, 692 (1st Cir.1984); *Reed v. Armstrong Cork Co.,* 577 F.Supp. 246, 247–48 (E.D. Ark.1983) (applying Arkansas law).

### B. Inter–Ag is a "Mere Continuation of Vertac"

30. The Eighth Circuit, in *Tucker v. Paxson Machine Co,* 645 F.2d 620, 625–26 (8th Cir.1981), identified the key factors necessary to establish successor liability under the "mere continuation" doctrine:

The majority of courts considering this exception emphasize a common identity of officers, directors, and stock between

the selling and purchasing corporations as the key element of a "continuation." *Accord, Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458–59 (11th Cir. 1985); *Dayton v. Peck, Stow & Wilcox Co.,* 739 F.2d 690, 693 (1st Cir.1984); *Leannais v. Cincinnati, Inc.,* 565 F.2d 437, 440 (7th Cir.1977). In discussing the "mere continuation" doctrine, the Eighth Circuit relied on *Brockmann v. O'Neill,* 565 S.W.2d 796, 798 (Mo.Ct.App.1978), in which the court found a mere continuation where the same individuals were shareholders, directors and officers in both the predecessor and successor corporations.

31. There is a continuity of shareholders between Vertac and Inter–Ag. Phoenix owns both 100 percent of Vertac's stock and 100 percent of InterCapital's stock; InterCapital, in turn, owns 100 percent of Inter–Ag's stock. Thus, Phoenix, in effect owns both Vertac and Inter–Ag. Moreover, C.P. Bomar, Jr., the former chairman of the board of Vertac and current president and sole director of Inter–Ag, owns 100 percent of the common stock of Phoenix. Indeed in the notes which Bomar prepared for the December 16 meeting with Dow, Bomar wrote "Bomar owns Vertac" and "Inter–Ag owned by Inter–Capital Industries which is owned by Bomar and Tomblin."

32. There is a continuity of directors between Vertac and Inter–Ag. Bomar became the sole director of Inter–Ag at its founding on December 4, 1986; at the same time, he was chairman of the board of Vertac. Although Bomar resigned as a director of Vertac on December 31, 1986, he continued to occupy his office at Suite 3121, 5100 Poplar in Memphis, which was rented by Vertac and adjacent to the Vertac offices in Suite 3122. More significantly, on February 7, 1987, Bomar, acting as representative of Vertac's sole shareholder, Phoenix, ratified the decision of the Vertac board of directors to enter into the transaction with Inter–Ag, of which he is sole director and president. (PX 10, 22, 24, 33, 40 and 41).

33. There is a continuity of officers between Vertac and Inter–Ag. J. Randal Tomblin, the president of Vertac, was appointed executive vice president of Inter–Ag on the day after its creation on December 5, 1986. Indeed, Tomblin was serving as an officer in both companies, at the time he concluded the February 9 sale of assets between them. Bomar, who is president of Inter–Ag, had been president of Vertac until June 30, 1986 and had continued as chairman of the board of Vertac until December 31, 1986. Shortly, after the February 9 and 10 transactions, Johnny L. Hanna, Gerald Manley and Anne Pekovich, who served as officers of Vertac, assumed the same officer positions in Inter–Ag.

34. Thus, each of the key elements of a "mere continuation" identified by the Eighth Circuit is present in this case. Moreover, other factors demonstrate a continuation. Inter–Ag hired Vertac's marketing and administrative staff. Inter–Ag took over Vertac's offices. Inter–Ag marketed the same products previously marketed by Vertac, using the Vertac trademarks and trade names. Inter–Ag used Vertac's customer lists and filled outstanding orders from Vertac customers. (PX 46, 48 and 53).

35. Inter–Ag is a "mere continuation" of Vertac. *Tucker v. Paxson Machine Co.,* 645 F.2d 620, 625–26 (8th Cir.1981). As a "mere continuation" of Vertac, Inter–Ag is liable to the United States and ADPC & E for all of Vertac's obligations under the Consent Decree and the Stipulation, and under all other applicable federal and state environmental laws.

**C. There has been a DeFacto Merger between Vertac and Inter–Ag**

36. "A *de facto* merger occurs where one corporation is absorbed by another but without compliance with the statutory requirements for a merger.... Such a merger makes the surviving corporation liable for the claims against the predecessor corporation." *Arnold Graphics Industries, Inc. v. Independent Agent Center, Inc.,* 775 F.2d 38, 42 (2d Cir.1985).

37. The courts, including the Eighth Circuit, have developed a variety of criteria

to ascertain whether a transaction is a *de facto* merger:

(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

(2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

(3) The seller corporation ceases its ordinary business operation, liquidates, and dissolves as soon as legally and practically possible.

(4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Keller v. Clark Equipment Co.*, 715 F.2d 1280, 1291 (8th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984); *Accord, Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir.1985), *cert. denied* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985) (court applies doctrine in environmental law context); *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457–58 (11th Cir. 1985).

38. It is not necessary that all of these criteria be found for there to be a *de facto* merger. *Atlas Tool Co. v. IRS*, 614 F.2d 860, 870 (3d Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136, 143 (E.D.Mich.1979). Evidence of fraudulent intent is not necessary to establish a *de facto* merger. *Keller v. Clark Equipment Co.*, 715 F.2d 1280, 1294 (8th Cir.1983), *cert. denied*, 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984).

39. The facts in this case satisfy each of the elements of the doctrine. First, there is a continuity of the enterprise, with Inter–Ag conducting the same agricultural chemicals marketing business which Vertac had conducted, and employing the same officers and personnel that had been employed by Vertac. Inter–Ag is also using the same premises and assets which Vertac had used to conduct its business.

40. Second, there is the continuity of shareholders with the shares of both Vertac and InterCapital, Inter–Ag's parent, being wholly owned by Phoenix. Thus, Phoenix, and its sole common stock shareholder, Bomar, control and own both Inter–Ag and Vertac. Although the cases which discuss the *de facto* merger doctrine have generally concerned transactions where the assets of one corporation are sold for the stock of the other, the element of continuity of shareholders is demonstrated in this case because at the time of the February 9 transaction, both companies had common shareholders.

41. Third, following the transactions of February 9 and 10, Vertac ceased all of its ordinary business activities. Although Vertac has not yet dissolved, it has only one employee and no on-going source of income except the interest payments on the trusts. *See Keller v. Clark Equipment Co.*, 715 F.2d at 1291 (successor corporation found liable under *de facto* merger doctrine when predecessor continued to exist but had "no employees or business activities capable of producing income").

42. Fourth, as part of the purchase agreement, Inter–Ag agreed to "accept assignment of Vertac's obligations to supply Inventories under supply agreement and sales contracts Vertac has with its customers." Also, on February 12, 1987, Vertac announced to its customers that Inter–Ag would fill any outstanding orders they had with Vertac. Inter–Ag also assumed Vertac's lease on its office space and its obligations under its operating agreement with Falls Chemical. (PX 44). Accordingly, Inter–Ag assumed the liabilities of Vertac necessary for the uninterrupted continuation of its business.

43. Thus, there has been a *de facto* merger between Inter–Ag and Vertac, and Inter–Ag is liable as Vertac's corporate successor to the United States and ADPC & E under the consent Decree, the Stipula-

tion and under federal and state environmental laws.

### D. The February 9 and 10 Transactions were Fraudulent

44. Under the law of the States of Arkansas and Tennessee, a conveyance is fraudulent if made with the intent to hinder, delay, or defraud creditors. Ark.Stat. Ann. § 68–1302 (1979); T.C.A. § 66–3–101. *Macon Bank and Trust Co. v. Holland,* 715 S.W.2d 347, 349 (Tenn.App.1986); *Lessman v. Dawson,* 14 Ark.App. 285, 687 S.W.2d 860, 862 (1985). Because the February 9 agreement between Vertac and Inter–Ag was executed in Tennessee and provided that it was to be interpreted under the laws of Tennessee, Tennessee law may apply. Because the Jacksonville site is located in Arkansas and the plaintiffs' claims arose in Arkansas, Arkansas law may apply. The result is the same, whether Arkansas or Tennessee law applies.

45. The United States and ADPC & E were "creditors" of Vertac at the time of the Inter–Ag transaction within the meaning of the Arkansas and Tennessee fraudulent conveyance statutes. Under the Tennessee fraudulent conveyance statutes, "creditor" is defined as a "person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." T.C.A. § 66–3–301(3). The Tennessee courts have also construed "creditor" for purposes of the fraudulent conveyance statute broadly. *Oliphant v. Moore,* 155 Tenn. 359, 293 S.W. 541 (1927) (plaintiff in action to recover damages for tort is "creditor" within meaning of fraudulent conveyance statute even though judgment had not yet been obtained); *Scarborough v. Pickens,* 170 S.W.2d 585 (Tenn.App.1942) (plaintiff in action for breach of promise to marry and for seduction is "creditor" for purposes of fraudulent conveyance). Similarly, although "creditor" is not a defined term in the Arkansas fraudulent conveyance statute, the term has been accorded a broad construction by Arkansas courts. *See Hernton v. Short,* 121 Ark. 383, 181 S.W. 142, 144 (1915). *See also Sieb's Hatcher-*

*ies, Inc. v. Lindley,* 111 F.Supp. 705 (W.D. Ark.1953), *aff'd,* 209 F.2d 674 (8th Cir. 1954). The United States and ADPC & E, by virtue of their judgment creditor status, are Vertac's creditors under the fraudulent conveyance statutes.

46. The Supreme Court stated in *Shapiro v. Wilgus,* 287 U.S. 348, 354, 53 S.Ct. 142, 144, 77 L.Ed. 355 (1932), interpreting a Pennsylvania fraudulent conveyance statute which is similar to those of Tennessee and Arkansas:

A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. *Means v. Dowd,* 128 U.S. 273, 281 [9 S.Ct. 65, 32 L.Ed. 429]. The belief even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay.

The mere claim that "fair value" was given in exchange for transferred assets does not insulate the transfer from a charge of fraud:

Whether or not Wren [who controlled the two corporations whose assets were transferred] believed that the assets he took to be without value to the creditors of Stereo and Marketing, *whether or not he believed that he gave in exchange property of fair, or equivalent, value, makes no difference. He did not have the right to strip these corporations of everything which gives a business its value, as he did, and did intentionally and deliberately.*

*In re Checkmate Stereo & Electronics, Ltd.,* 9 B.R. 585, 612 (Bankr.E.D.N.Y.1981), *aff'd,* 21 B.R. 402 (E.D.N.Y.1982) (emphasis added).

47. " '[F]rauds are generally secret, and have to be tracked by the footprints, marks, and signs made by the perpetrators, and discovered by the light of the attending facts and circumstances....' " *Macon Bank & Trust Co. v. Holland,* 715 S.W.2d 347, 349 (Tenn.App.

1986), *quoting* Gibson, *Suits in Chancery*, § 1057 at 328 (1955). Accordingly, various circumstances which are deemed "badges" or indicia of fraud have been identified. These badges of fraud include insolvency or indebtedness of the transferror, inadequate or fictitious consideration, the pendency or threat of litigation, secrecy or concealment, and the fact that disputed transactions were conducted in a manner differing from usual business transactions. *Ouachita Electric Co–Op v. Evans St. Clair*, 12 Ark.App. 171, 672 S.W.2d 660, 664–65 (1984); *Rees v. Craighead Investment Co.*, 251 Ark. 336, 472 S.W.2d 92, 95 (1971); *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 249 (Tenn.App.1986). Each of these badges are present in this case: Vertac was insolvent and indebted to the United States, ADPC & E and Dow; future proceedings were pending in this lawsuit and in a separate lawsuit filed by the United States and ADPC & E, *United States v. Vertac Chemical Corp.*, No. LR–C–86–660 (E.D.Ark.); the February 9 and 10 transactions were not revealed to the United States or ADPC & E; and the sale of assets for Vertac to Inter–Ag was not for fair market value and not in the ordinary course of Vertac's business.

48. The testimony of Bomar and Tomblin and the documents which they executed provide overwhelming proof that they intended to place the assets and businesses of Vertac in a new corporation, Inter–Ag, in order that those assets and businesses were not subject to the environmental claims of the United States and ADPC & E. (PX 13, 14, 18, 19 and 33).

49. The owners and management of Vertac, particularly Bomar and Tomblin, intended to defraud, hinder and delay Vertac's creditors, the United States and ADPC & E, by transferring its assets and businesses to Inter–Ag.

50. A conveyance is also fraudulent under the law of Tennessee if made without fair consideration and the person making it: (a) was insolvent at the time of the transaction, T.C.A. § 66–3–305; (b) is engaged in business for which his remaining property is an unreasonably small capital, T.C.A.

§ 66–3–306; or (c) intends or believes he will incur debts beyond his ability to pay, T.C.A. § 66–3–306., *See Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn.App.1986).

51. The transfer to Inter–Ag was also constructively fraudulent under the law of Tennessee. Vertac received less than fair consideration for the business it transferred to Inter–Ag. *Cf. Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir. 1980). Vertac was insolvent at the time of this transfer. Vertac had no property with which to carry on a business after this transfer. And Vertac had incurred debts beyond its ability to pay in the form of its obligations under the Consent Decree and federal and state environmental laws. For these three distinct reasons, Vertac's transfer of assets was constructively fraudulent under Tennessee law. T.C.S. §§ 66–3–305, 66–3–306.

52. Because the February 9 transfer of assets and businesses from Vertac to Inter–Ag was fraudulent, it is void against Vertac's creditors, the United States and ADPC & E. Accordingly, Inter–Ag is liable to the United States and ADPC & E under the Consent Decree and under federal and state environmental laws as Vertac's corporate successor.

**E. This Court has Jurisdiction over Inter–Ag as Vertac's Corporate Successor**

53. Rule 25(c) of the Federal Rules of Civil Procedure provides that where a party to an action transfers its interest, the case may continue both against the original party and the person to whom the interest is transferred.

54. Having obtained *in personam* jurisdiction over the original defendant Vertac, the court retains *in personam* jurisdiction over its corporate successor Inter–Ag. *Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1262–64 (Fed.Cir.1985). "Were this not so, the owners of the property could merely transfer legal ownership of the assets from one shell corporation to another in a different jurisdiction, putting a party whose ini-

tial suit satisfied the jurisdictional requirements to the immense burden of chasing the involved assets from courtroom to courtroom." *Minnesota Mining & Manufacturing Co.*, 757 F.2d at 1263.

55. Inter–Ag had actual notice of these proceedings, since it was deposed as a corporation under Rule 30(b)(6) of the Federal Rules of Civil Procedure. Moreover, three Inter–Ag officers testified at the hearing: Bomar, president, sole director and controlling shareholder of Inter–Ag; Tomblin, executive vice president of Inter–Ag; and Hanna, vice president and secretary-treasurer of Inter–Ag. Bomar was separately represented by counsel during his testimony.

56. If venue has been properly established over the original defendant, Vertac, venue remains proper over its corporate successor, Inter–Ag. *Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1264 (Fed.Cir. 1985); *Dolgow v. Anderson*, 45 F.R.D. 470, 472–73 (E.D.N.Y.1968).

## VI. The February 9 and 10 Transactions violated the Bulk Sales Act

57. Under Arkansas and Tennessee law, a "bulk transfer" is "any transfer in bulk and not in the ordinary course of the Transferror's business of a major part of the materials, supplies, merchandies or other inventory of an enterprise...." Ark.Stat. Ann. § 85–6–102; T.C.A. § 47–6–102. The Bulk Sales Acts of Arkansas and Tennessee, which are virtually identical, require the transferror to prepare a list of its creditors, including any person known to have a claim against the transferror, even if the claim is disputed. T.C.A. § 47–6–104(2); Ark.Stat.Ann. § 85–6–106(3). Both Acts also require that notice be given ten days prior to the transfer to all creditors. Ark. Stat.Ann. § 85–6–105; T.C.A. § 47–6–105. *See also Phillips v. Tires, Tubes, Wheels, Inc.*, 274 Ark. 326, 625 S.W.2d 449, 450–451 (1981); *Ouachita Electric Co-Op v. Evans-St. Clair*, 12 Ark.App. 171, 672 S.W.2d 660, 662–64 (1984). Any bulk transfer not conducted in accordance with the statutory

requirements is ineffective against any creditor of the transferror. *Id.*

58. The United States and ADPC & E were "creditors" of Vertac within the meaning of the Arkansas and Tennessee Bulk Sales Acts. *See Third Nat'l. Bank of Nashville v. Keathley*, 35 Tenn.App. 82, 242 S.W.2d 760, 768 (1951) (bulk sales statute requires notice "to all creditors of the seller of a stock of merchandise and not merely to mercantile creditors"); *Porter v. Browne-Hinton Wholesale Grocery Co.*, 178 Ark. 1200, 11 S.W.2d 451, 451 (1928) ("If [the appellee] had a judgment against [the seller in bulk], it would be a judgment creditor, and would have the same right to object to a violation of the Bulk Sales Law and to enforce its rights thereon as if it had been a common creditor.") *Accord, Mahoney-Jones Co. v. Sam Bros.*, 128 Tenn. 207, 159 S.W. 1094, 1095 (1913). *See also Huckins v. Smith*, 29 F.2d 907, 910 (8th Cir.1928), *cert. denied*, 280 U.S. 561, 50 S.Ct. 19, 74 L.Ed. 615 (1929) (Arkansas bulk sales law is "strictly remedial" "for the protection of all creditors of the seller"); *Noltze Motor Co. v. Burrows-Moore Pontiac*, 157 F.Supp. 593 (N.D. Iowa 1958) (United States was a creditor under bulk sales act based on debtor's failure to pay taxes).

59. In the February 9 and 10 transactions, Vertac transferred over 90 percent of its inventory, by selling some of it directly to Inter–Ag and by returning the rest to Dow who simultaneously resold it to Inter–Ag. Vertac also sold to Inter–Ag all of its furniture and equipment not located on the Jacksonville Site. These transactions were not in the ordinary course of Vertac's business because they had the effect of putting Vertac out of business. No prior notice was given to the United States, ADPC & E or any other Vertac creditor, except Dow. (PX 44 and 45). Accordingly, under the Bulk Sales Act, the February 9 and 10 transactions are void and ineffective against the claims of the United States and ADPC & E.

## VII. The United States' Claims Against Vertac Are Entitled to Priority over the Claims of Other Creditors

### A. The Federal Priority Statute, 31 U.S.C. § 3713

60. Under 31 U.S.C. § 3713(a)[1], a claim of the United States Government is entitled to first priority of payment when a debtor is insolvent and (1) the debtor makes a voluntary assignment of property, (2) property of the debtor is attached, or (3) the debtor commits an act of bankruptcy. Section 3713(b)[2] establishes personal liability for a representative of a debtor (or of an estate) who pays other claimants before paying the claims of the United States. *See United States v. Cole*, 733 F.2d 651, 653–54 (9th Cir.1984).

61. Although the current language of section 3713(a) was enacted by Congress in 1982, the provision has existed with only minor changes since 1789. *United States v. Moore*, 423 U.S. 77, 80–81, 96 S.Ct. 310, 312–313, 46 L.Ed.2d 219 (1975). Subsection (b) of section 3713, imposing personal liability on those who frustrate the Government's priority, is nearly as old, having first been enacted in 1799. *King v. United States*, 379 U.S. 329, 335, 85 S.Ct. 427, 430, 13 L.Ed.2d 315 (1964). Both subsections of section 3713, however, spring from "motives of public policy, in order to secure an adequate revenue to sustain the public burdens and discharge the public. . . ." *United States v. State Bank of North Carolina*, 31 U.S. (6 Pet.) 29, 35, 8 L.Ed. 308 (1832). To achieve this end, the Supreme Court and other federal courts have consistently and repeatedly stated that the priority statute is to be construed liberally, *see, e.g., id.; Bramwell v. U.S. Fidelity Co.*, 269 U.S. 483, 487, 46 S.Ct. 176, 177, 70 L.Ed. 368 (1926); *Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 352 (9th Cir.1965); *United States v. Coyne*, 540

F.Supp. 175, 178 (D.D.C.1981), avoiding "technical requirements" of the common law that might "unnecessarily restrict" its application, *United States v. Moore*, 423 U.S. at 83–84, 96 S.Ct. at 314; *Price v. United States*, 269 U.S. 492, 500, 46 S.Ct. 180, 181, 70 L.Ed. 373 (1926). The burden lies on those who claim the Government's priority does not apply to show that they are not within the reach of section 3713. *Bramwell v. U.S. Fidelity Co.*, 269 U.S. at 483, 46 S.Ct. at 176; *United States v. Cole*, 733 F.2d 651, 654 (9th Cir.1984).

### B. Vertac was indebted to the United States and Insolvent

62. Vertac was indebted to the United States and ADPC & E, within the meaning of 31 U.S.C. § 3713, as of the time of the Inter–Ag transaction by virtue of their status as judgment creditors under the Consent Decree and Stipulation. *See United States v. Moore*, 423 U.S. 77, 83–84, 96 S.Ct. 310, 314, 46 L.Ed.2d 219 (1975); *United States v. 58th Street Plaza Theater, Inc.*, 287 F.Supp. 475, 496 (S.D.N.Y. 1968); *United States v. Coyne*, 540 F.Supp. 175, 179 (D.D.C.1981); *In re Gottheiner*, 3 B.R. 404, 407 (Bankr.N.D.Cal.1980), *aff'd*, 703 F.2d 1136 (9th Cir.1983). Vertac was also indebted to the United States within the meaning of section 3713 by virtue of EPA's performance of Vertac's duties under the Consent Decree at the Jacksonville site. *Id.* Vertac's obligation to the United States was not contingent at the time of the February 9, 1987 transaction; rather, as in *United States v. Moore*, the obligation was "fixed and independent of 'events after insolvency' [with] only the precise amount of that obligation await[ing] future events." 423 U.S. at 85, 96 S.Ct. at 315.

---

1. Section 3713(a) provides in part:
   (1) A claim of the United States Government shall be first paid when—
   (A) a person indebted to the Government is insolvent and—
   (i) the debtor without enough property to pay all debts makes a voluntary assignment of property; [.]

2. Section 3713(b) provides:
   (b) A representative of a person or an estate (except a trustee under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government.

63. A corporation is insolvent within the meaning of 31 U.S.C. § 3713 when its liabilities exceed its assets. *United States v. Oklahoma,* 261 U.S. 253, 261, 43 S.Ct. 295, 298, 67 L.Ed. 638 (1923). *See also United States v. Coyne,* 540 F.Supp. 175, 179 (D.D.C.1981); *In re Gottheiner,* 3 B.R. 404, 407–408 (Bankr.N.D.Cal.1980). Vertac was insolvent as of the time of the Inter–Ag transaction in that its liabilities exceeded its assets.

**C. Vertac made a Voluntary Assignment of its Property**

64. Any voluntary assignment of the debtor's property triggers the priority statute, regardless of the purpose or manner of the assignment, *Bramwell v. U.S. Fidelity Co.,* 269 U.S. 483, 488–89, 492, 46 S.Ct. 176, 177, 178, 70 L.Ed. 368 (1926), and what constitutes an "assignment" is liberally construed. *Id.* Once the assignment occurs, the person with possession and control of the property becomes a trustee for the United States and is bound to pay its claim first out of the proceeds of the debtor's property. *Id.* at 487, 46 S.Ct. at 177. *Accord United States v. Oklahoma,* 261 U.S. 253, 260, 43 S.Ct. 295, 298, 67 L.Ed. 638 (1923); *United States v. Gotwals,* 156 F.2d 692 (10th Cir.), *cert. denied,* 329 U.S. 781, 67 S.Ct. 204, 91 L.Ed. 670 (1946); *see also United States v. Coyne,* 540 F.Supp. 175 (D.D.C.1981) (payments to corporate insiders constituted "assignment" within meaning of priority statute); *United States v. Cole,* 733 F.2d 651, 654 (9th Cir.1984) (assignment of proceeds of sale of assets for benefit of creditors subject to Government's priority). Vertac's transfer of $1,671,500 to Dow Chemical Company on February 10 and May 5, 1987, were voluntary assignments within the meaning of section 3713, as was the payment to Dow of $50,000 by Inter–Ag on behalf of Vertac in July 1987. These assignments occurred at a time when Vertac did not have enough property to pay all its debts. Vertac therefore violated subsection (i) of 31 U.S.C. § 3713(a)(1)(A) and is liable to the United States for the amounts transferred.

**D. Vertac Committed "Acts of Bankruptcy" within the Meaning of the Federal Priority Statute**

65. Vertac also violated subsection (iii) of 31 U.S.C. § 3713(a)(1)(A) by committing "acts of bankruptcy" at a time when it was insolvent and indebted to the United States. An "act of bankruptcy" is not a term defined in section 3713, but rather, as with other terms in that provision, draws its meaning from the law of bankruptcy. *United States v. Oklahoma,* 261 U.S. 253, 262, 43 S.Ct. 295, 298, 67 L.Ed. 638 (1923); *Bramwell v. U.S. Fidelity Co.,* 269 U.S. 483, 489, 46 S.Ct. 176, 177, 70 L.Ed. 368 (1926); *See also United States v. Moore,* 423 U.S. 77, 84, 96 S.Ct. 310, 314, 46 L.Ed.2d 219 (1975); *W.T. Jones & Co. v. Foodco Realty, Inc.,* 318 F.2d 881, 885 (4th Cir.1963); *Lakeshore Apartments, Inc. v. United States,* 351 F.2d 349, 353 (9th Cir.1965). An "act of bankruptcy" within the meaning of subsection (iii) includes preferential transfers, *Lakeshore Apartments, Inc.,* 351 F.2d 15 353; *United States v. Gotwals,* 156 F.2d 692, 695 (10th Cir.), *cert. denied,* 329 U.S. 781, 67 S.Ct. 204, 91 L.Ed. 670 (1946); *In re Gottheiner,* 3 B.R. 404, 408 (Bankr.N.D.Cal.1980), and fraudulent transfers, *United States v. Mr. Hamburg Bronx Corp.,* 228 F.Supp. 115, 121 (S.D.N.Y.1964); *Gottheiner,* 3 B.R. at 408.

66. A preferential transfer is any transfer to or for the benefit of a creditor for or on account of an antecedent debt, made while insolvent, the effect of which transfer is to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class. 11 U.S.C. § 21(a)(2). *See also In re Gottheiner,* 3 B.R. 404, 408 (Bankr.N.D.Cal.1980). The transfer of assets to Inter–Ag was part of a larger transaction with its purpose to pay off Dow, and thus to secure a Dow supply contract for the newly-formed Inter–Ag. The $1,671,500 paid to Dow by Inter–Ag was intended to satisfy Vertac's antecedent debt to Dow. Although collateral was returned to Dow as part of the same transaction, this $1,671,500 payment was unsecured. This transaction occurred at a time

when Vertac was insolvent. The United States and Dow were therefore both unsecured creditors at the time of the Vertac–Inter–Ag–Dow transaction. They were therefore creditors of the same class. This transfer was therefore preferential and thus an act of bankruptcy within the meaning of section 3713. Simlarly, the payment to Dow by Inter–Ag on Vertac's behalf in July 1987 of $50,000 also constituted a preferential transfer.

67. A fraudulent transfer of a debtor's assets is also an "act of bankruptcy" within the meaning of subsection (iii) of section 3713(a)(1)(A). *United States v. Mr. Hamburg Bronx Corp.*, 228 F.Supp. 115, 121 (S.D.N.Y.1964); *In re Gottheiner*, 3 B.R. 404, 408–409 (Bankr.N.D.Cal.1980). Under the Bankruptcy Act of 1898 (as well as the current Bankruptcy Code), a transfer is fraudulent if it was made or incurred with an intent to hinder, delay, or defraud existing or future creditors. 11 U.S.C. §§ 21(a)(1) and 107(d)(2) (1976). 11 U.S.C. § 548(a)(1) (1984).

68. Where a transfer is only a step in a general plan, the "plan ... must be viewed as a whole with all its composite implications." *Buffum v. Peter Barceloux Co.*, 289 U.S. 227, 232, 53 S.Ct. 539, 541, 77 L.Ed. 1140 (1933). A plan to appropriate the assets of an insolvent debtor, while holding the debtor's creditors at bay, is in fraud of creditors, even if done with the utmost good faith. *Shapiro v. Wilgus*, 287 U.S. 348, 353, 53 S.Ct. 142, 143, 77 L.Ed. 355 (1932); *Leventhal v. Spillman*, 234 F.Supp. 207 (E.D.N.Y.1964), *Aff'd*, 362 F.2d 264 (2d Cir.1966). "A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act, 'hinders, delays or defrauds creditors' within the meaning of the [the Bankruptcy Act]." *Dean v. Davis*, 242 U.S. 438, 444, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917). *See also In re Checkmate Stereo & Electronics, Ltd.*, 9 B.R. 585, 612–13 (Bankr.E.D.N.Y.1981), *Aff'd*, 21 B.R. 402 (E.D.N.Y.1982).

69. Vertac's transfer to Inter–Ag of those assets associated with its only remaining ongoing operations was an effort to hinder, delay, and defraud its existing creditors, including the United States and ADPC & E, within the meaning of the authorities cited. This transfer was therefore an act of bankruptcy as defined in subsection (iii) of 31 U.S.C. § 3713(a)(1)(A).

70. The Bankruptcy Act of 1898 (as well as the current Bankruptcy Code) also deems fraudulent certain transfers, regardless the transferror's actual intent. 11 U.S.C. §§ 21(a)(1) and 107(d)(2) (1976). 11 U.S.C. § 548(a)(2) (1984). Under Section 107(d)(2) of the Bankruptcy Act of 1898, a transfer is fraudulent if the debtor received less than fair consideration in exchange for the transfer and (1) was insolvent on the date that such transfer was made or became insolvent as a result of such transfer, (2) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital, or (3) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

71. Vertac received less than fair consideration for the business it transferred to Inter–Ag. *Cf. Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980). Vertac was insolvent at the time of this transfer. Vertac had no property with which to carry on a business after this transfer. And Vertac intended to incur or believed that it would incur debts beyond its ability to pay, in the form of the United States and Hercules' assumption of Vertac's environmental responsibilities under the Consent Decree. The transfer to Inter–Ag was thus constructively fraudulent under three distinct subsections of the Bankruptcy Act of 1898. As a result, subsection (iii) of 31 U.S.C. § 3713(a)(1)(A) was again violated.

**E. Inter–Ag is liable to the United States as Persons who Authorized Payments to Dow on Behalf of Vertac when Vertac was Insolvent**

72. Under the February 9 and 10 agreements, Inter–Ag agreed to turn over the purchase price of the assets it bought from Vertac, $1,675,000, to Dow on Vertac's behalf in satisfaction of Vertac's ante-

cedent debt to Dow. Inter–Ag did in fact pay $1,671,500 to Dow on Vertac's behalf, and has recently paid an additional $50,000 to Dow on behalf of Vertac as guarantor of Vertac's note to Dow. Accordingly, Inter–Ag is liable to the United States under 31 U.S.C. § 3713(b) as a representative of Vertac paying the claims of another Vertac creditor before the claims of the United States are satisfied.

### VIII.  A Receiver should be Appointed for Both Vertac and Inter–Ag

73.  The authority of a federal court exercising federal question jurisdiction to appoint a receiver is a question of federal law. *United States v. Chester Park Apartments*, 332 F.2d 1, 3–4 (8th Cir.), *cert. denied*, 379 U.S. 901, 85 S.Ct. 191, 13 L.Ed.2d 176 (1964). The original complaints in this action were filed pursuant to section 7003 of RCRA, 42 U.S.C. § 6973, and the United States and ADPC & E are judgment creditors of Vertac by virtue of the Consent Decree entered pursuant to RCRA. The Consent Decree also required Vertac to comply with the requirements of RCRA, TSCA and CERCLA. Moreover, Vertac is indebted to the United States for CERCLA response costs incurred by EPA in undertaking Vertac's responsibilities under the Consent Decree to manage the drummed and containerized wastes at the Jacksonville site. Federal law therefore controls whether the Plaintiffs are entitled to appintment of a receiver.

74.  Under section 7003 of RCRA, 42 U.S.C. § 6973, federal courts are empowered to fashion affirmative equitable relief to the extent necessary to eliminate risks posed by toxic waste. *See United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982) (preliminary injunction held to be statutory equitable relief under RCRA). Section 106(a) of CERCLA, 42 U.S.C. § 9606(a), similarly empowers federal courts "to grant such relief as the public interest and the equities of the case require." Thus, the appointment of a receiver is statutory equitable relief under RCRA and CERCLA. *See United States v. City of Detroit*, 476 F.Supp. 512 (E.D.Mich.1979) (receiver appointed for Detroit waste treatment plant at request of the United States in order to obtain compliance with federal water pollution control laws).

75.  The appointment of a receiver has also historically been considered an inherent power of a federal court sitting in equity. *Gross v. Missouri & A. Ry. Co.*, 74 F.Supp. 242, 244 (W.D.Ark.1947); *Levin v. Garfinckle*, 514 F.Supp. 1160, 1163 (E.D. Pa.1981). *See also United States v. Cedar–Riverside Land Co.*, 592 F.2d 470, 472 (8th Cir.1979). "Generally, an equity receiver is appointed for the purpose of either preserving, liquidating or operating the property involved pending final disposition of a case before the court." *Gross v. Missouri & A. Ry. Co.*, 74 F.Supp. 242, 244 (W.D.Ark.1947). Factors traditionally considered include (1) the possible existence of fraudulent conduct; (2) the danger of property being concealed, lost, or diminished in value; (3) the adequacy of legal remedies; and (4) the harm to the movant if appontment is denied versus the harm to opposing parties if appointment is granted. *Bookout v. Atlas Financial Corp.*, 395 F.Supp. 1338, 1341 (N.D.Ga.1974), *Aff'd*, 514 F.2d 757 (5th Cir.1975); *Haase v. Chapman*, 308 F.Supp. 399, 406 (W.D.Mo.1969). The appiontment of receiver is appropriate in aid of an outstanding injunction. *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977).

76.  The appointment of a receiver is a necessary remedy in this case. The evidence is overwhelming that Vertac engaged in the Inter–Ag transaction for the purpose of freeing its remaining, viable operations from the environmental liabilities associated with its Jacksonville site. The present management of Vertac has demonstrated its willingness to manipulate numbers and corporate assets to facilitate nonperformance of Vertac's environmental responsibilities under various orders previously entered by the Court. If a receiver is not appointed, the present management intends to continue liquidating Vertac's remaining assets without making any provision for the environmental liabilities. The evidence of fraud is clear and compelling. No harm should come to Vertac by a properly conducted receivership. In any event,

any harm to Vertac or its shareholder is greatly outweighed by the claims of the plaintiffs and the public interest in addressing the environmental problems at the Jacksonville site. The appointment of a receiver will aid in enforcement of the Consent Decree and Stipulation previously approved by the Court.

77. In order that the appointment of a receiver provide meaningful relief for the plaintiffs, the receivership shall extend not only over Vertac, which is now an empty shell, but also over Inter–Ag, Vertac's corporate successor, which is currently conducting Vertac's business operations.